[Cite as *Four Elyria Co., LLC v. Brexton Constr., L.L.C.*, 2022-Ohio-2989.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

FOUR ELYRIA COMPANY, LLC

    Appellants/Cross-Appellees

v.

BREXTON CONSTRUCTION, LLC, et al.

    Appellees/Cross-Appellants

C.A. Nos.    20CA011694
                 20CA011695

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    17CVI92092

DECISION AND JOURNAL ENTRY

Dated: August 29, 2022

HENSAL, Judge.

{¶1} Four Elyria Company, LLC ("Four Elyria") and David Thomas appeal from the judgments of the Lorain County Court of Common Pleas. Brexton Construction, LLC ("Brexton"), cross-appeals. This Court affirms in part, reverses in part, and remands the matter for further proceedings.

I.

{¶2} This case primarily involves a contract dispute between the owner of a shopping plaza and the construction manager the owner hired to oversee construction of the plaza. More specifically, it involves a dispute as to whether certain work the construction manager performed was within the scope of the contract between the construction manager and the owner, or whether the construction manager was entitled to compensation for that work outside of the contract.

{¶3} The underlying record is voluminous, involving multiple parties, claims, counterclaims, cross-claims, a third-party complaint, and several motions for summary judgment.

This Court will limit its discussion of the facts and procedural history to those relevant to the disposition of this appeal.

{¶4} We begin our discussion with a review of the parties followed by a timeline of the relevant events. Four Elyria is the owner of a shopping plaza called Chestnut Commons, a shopping center located in Elyria, Ohio that contains four retail stores. David Thomas and Grant Giltz, among others, are members of Four Elyria. Mr. Thomas, an attorney, handled some of the legal issues for Four Elyria, and Mr. Giltz was responsible for managing the construction on Chestnut Commons. At his deposition, Mr. Giltz testified as the Civil Rule 30(B)(5) witness on behalf of Four Elyria. David Pontia is the architect Four Elyria hired for the Chestnut Commons project. Mr. Pontia is not a party to the underlying lawsuits.

{¶5} Brexton is the construction manager Four Elyria hired to oversee the construction of Chestnut Commons. Timothy Galvin is the founder, past president, and current CEO of Brexton. At his deposition, Mr. Galvin testified as the Rule 30(B)(5) witness on behalf of Brexton. At all relevant times, Mary Beatty was the CFO, then executive vice president, then president of Brexton.[1]

{¶6} Protective Life Insurance Company ("Protective") is the lender that refinanced Chestnut Commons. Mr. Thomas is the member of Four Elyria who signed the loan documents on behalf of Four Elyria, as well as a personal guaranty and a borrower's affidavit, in connection with the refinancing.

{¶7} In November 2015, Four Elyria and Brexton engaged in discussions regarding the construction of Chestnut Commons, which included the construction of a Petco. As part of those

---

[1] Subsequent references to Brexton may include Brexton, Ms. Beatty, and Mr. Galvin, collectively.

discussions, Four Elyria's architect, Mr. Pontia, provided Brexton with Petco's prototype tenant improvement plans ("Prototype Plans"), among other documents, which were not site-specific. The Prototype Plans contained a disclaimer stating: "For Design Intent Only and Shall Not be Used for Construction Purposes." According to Mr. Pontia's deposition testimony, the Prototype Plans were sent to Brexton for pricing purposes because Petco had not issued the final, site-specific tenant improvement plans yet. Mr. Pontia was not involved in preparing the Prototype Plans, nor the final, site-specific tenant improvement plans, both of which were provided by Petco.

{¶8} Brexton also received Mr. Pontia's drawings for the project. On the cover page of the drawings, Mr. Pontia included a "Project Note[]" stating: "The Project Consists of Shell Building and Landlords T.I. Work. Tenants Interior T.I. Work to be Submitted under Separate Contract * * *." At his deposition, Mr. Pontia explained that this language meant that he expected there to be a separate set of construction documents for the Petco tenant improvement work. He also explained that the reference to the "Contract" in the "Project Note[]" referred to the contract between Pontia Architecture and Four Elyria, not a contract between Brexton and Four Elyria.

{¶9} In early January 2016, Brexton emailed Four Elyria its "all-in" price for the work Brexton was to perform at Chestnut Commons. Days later, Four Elyria and Brexton executed a construction manager at-risk guaranteed maximum price agreement (the "Contract"). The Contract and its attachments defined the scope of the work, listed the maximum guaranteed price as $2,475,508, and provided that Brexton would be "responsible for paying all costs of completing the Work which exceed the [guaranteed maximum price], as adjusted in accordance with this Agreement."

{¶10} The Contract provided that any changes in the work that impacted the guaranteed maximum price were to be formalized in a change order, and that Brexton was not obligated to

perform such work until a change order had been executed. The Contract also provided that, if there was a dispute as to whether any work was within the scope of the Contract, Brexton was to furnish Four Elyria with an estimate of the costs to perform the disputed work. The Contract further provided that Brexton was to submit any claim for an increase in the guaranteed maximum price to Four Elyria in writing.

The Contract contained an integration clause, stating that the Contract represented the entire agreement between the parties, and superseded all prior negotiations, representations, or agreements, either written or oral. "Contract Documents" was defined to include the "existing Contract Documents listed in section 15.1, drawings, specifications, [and] addenda issued and acknowledged prior to the execution of this Agreement[.]" Section 15.1 addressed the "Existing Contract Documents" and referenced five exhibits labeled A, B, C, D, and F.[2] Exhibit A was the list of drawings. Exhibit A did not include the Protype Plans, nor did it include the final, site-specific drawings for the Petco tenant improvement work, which were not in existence at the time the parties executed the Contract. At his deposition, Mr. Galvin acknowledged that the drawings contained in Exhibit A did contain some Petco tenant improvement work, albeit limited. According to Four Elyria, the "Contract Documents" included the Prototype Plans because those drawings were "issued and acknowledged" by Brexton prior to the execution of the Contract. Brexton disputes this, claiming that the only drawings incorporated into the Contract are those contained in Exhibit A. Exhibit C to the Contract was captioned "Assumptions & Clarifications" and provided: "[c]ompletion date for Petco to be 08/27/16."

---

[2] While inconsequential to this matter, we note that Exhibit D, the construction schedule, was not attached to the Contract.

{¶11} Section 3.4.2 of the Contract addressed the "Basis of Guaranteed Maximum Price" and required Brexton to "include with the [guaranteed maximum price] proposal a written statement of its basis" for the price. Section 3.4.2.1 required that statement to include "a list of the drawings and specifications, including all addenda, which were used in preparation of the [guaranteed maximum price] Proposal." "SEE EXHIBIT A" was filled in next to that language. Section 3.4.2.3 also required that statement to include "a list of the assumptions and clarifications made by [Brexton] in the preparation of the [guaranteed maximum price] Proposal to supplement the information contained in the drawings and specifications[.]" "SEE EXHIBIT C" was filled in next to that language.

{¶12} In April 2016, Four Elyria sent Brexton the final, site-specific drawings for the Petco tenant improvement work ("Petco T.I. work"). Brexton used those drawings to complete its work on the Petco. According to Brexton, the Petco T.I. work was not part of the Contract, but it performed that work with the expectation that Four Elyria would pay for it separately, that is, in addition to what Four Elyria owed Brexton under the Contract.

{¶13} According to Mr. Galvin's deposition testimony, Brexton did not submit a written change order to Four Elyria for the Petco T.I. work because Four Elyria instructed Brexton not to do so. Ms. Beatty testified similarly and indicated that Brexton verbally told Four Elyria that a change order for approximately $500,000 was forthcoming for the Petco T.I. work, but that Four Elyria asked Brexton not to submit a change order because it did not want its lender to be aware of it.

{¶14} Mr. Giltz, however, disputed this during his deposition testimony. According to him, the Petco T.I. work was included in the Contract and, at the time Brexton received the final, site-specific Petco drawings, there was no discussion between Four Elyria and Brexton that the

cost of the Petco T.I. work would exceed the guaranteed maximum price under the Contract. While some testimony indicated that a change order was circulated internally within Brexton and that it was hand-delivered to Four Elyria, there is no dispute that a change order was never executed for the Petco T.I. work.

{¶15} Brexton substantially completed the entire project in November 2016. On November 28, 2016, Ms. Beatty submitted two pay applications to Four Elyria: one for the balance due under the Contract, and one for the retainage. Along with each pay application, Ms. Beatty submitted a corresponding "Unconditional Waiver and Release of Liens" (collectively, the "Waiver and Release"), which indicated that, once paid per the corresponding pay application, Brexton had been paid in full under the Contract.

{¶16} The Waiver and Release listed the project address as "Chestnut Commons" and provided that Brexton "has been paid, receipt and sufficiency of which is hereby acknowledged, and does hereby waive, release and quitclaim in favor of [Four Elyria] * * * all rights that [Brexton] may have to a lien upon [Chestnut Commons] * * * by reason of or on account of any work, labor, services[,] equipment and materials furnished by [Brexton.]" It further provided that Brexton "releases and waives any and all manner of liens whatsoever which [Brexton] may have upon the Project, or any portion of the lands of Owners or buildings thereon standing, for labor, material, services, or equipment provided for the project[.]" There is no dispute that Four Elyria paid Brexton the guaranteed maximum price under the Contract.

{¶17} As early as November 30, 2016, Four Elyria received communications that some of Brexton's subcontractors remained unpaid for the Petco T.I. work they performed at Chestnut Commons. For example, on November 30, 2016, a plumbing subcontractor emailed Mr. Giltz asking whether Mr. Giltz had heard anything from Brexton about its payments. Mr. Giltz

forwarded that email to Ms. Beatty and another Brexton employee, requesting that they communicate with the subcontractor regarding its payments. On December 1, 2016, Mr. Giltz received another email from a subcontractor indicating that it was still owed money. Mr. Giltz forwarded that email to Ms. Beatty and the same Brexton employee the next day, indicating that the subcontractor's email made Four Elyria "nervous when we paid [Brexton] for the Elyria job already[.]" Four Elyria continued to receive communications regarding unpaid subcontractors. According to Mr. Giltz, he assumed Brexton was handling the situation, and that the subcontractors were being paid in due course.

{¶18} On February 13, 2017, Four Elyria and Mr. Thomas executed loan documents and a borrower's affidavit related to the refinancing of Chestnut Commons through Protective. The loan documents included: (1) a promissory note; (2) an open-ended mortgage and security agreement; (3) an assignment of rents and leases; and (4) a guaranty signed by Mr. Thomas. The effective date of those documents was listed as March 27, 2017, the day the loan closed.

{¶19} The mortgage contained a representation that no notice of commencement as to the property had been filed prior to the filing for the record of the mortgage. It also contained a covenant that "Borrower shall promptly bond over or discharge any mechanics', laborers', materialmen's or similar lien * * * which relates to Borrower or the Property." In the borrower's affidavit, Mr. Thomas averred, in part, that he had no "notice of any unpaid bills or claims for labor or services performed or materials furnished with respect to the Property[,]" and that there were "no outstanding indebtedness or liens against the Property[.]" Under the terms of the mortgage, providing an untrue representation in the borrower's affidavit constituted an event of default.

{¶20} On February 21, 2017, after Four Elyria and Mr. Thomas executed the loan documents, Brexton submitted a spreadsheet of cost overages to Four Elyria. According to Brexton, the Petco T.I. work was not within the scope of the Contract, and Four Elyria owed it almost $500,000.00 for that work. According to Four Elyria, the Petco T.I. work was within the scope of the Contract, and it had already paid Brexton in full under the Contract. Four Elyria, therefore, refused to pay Brexton. Brexton, in turn, did not pay its subcontractors for the Petco T.I. work they performed.

{¶21} Two subcontractors filed mechanic's liens against Chestnut Commons after Four Elyria and Mr. Thomas executed the loan documents and borrower's affidavit (i.e., after February 13, 2017).[3] CTI Contracting filed its lien on March 10, 2017. Four Elyria paid CTI Contracting for its work, and the lien was released on March 27, 2017. That same day, the Protective loan closed. Kelly Brothers Construction, Inc. then filed its lien on April 7, 2017. Kelly Brothers Construction, Inc. was later paid, and the lien was released. On April 7, 2017, Brexton filed a lien affidavit, asserting that it had not been paid $499,321.19 for the Petco T.I. work. Four Elyria refused to pay Brexton, and the underlying lawsuits followed.

{¶22} Four Elyria sued Brexton, asserting claims for: (1) breach of contract based upon Brexton's failure to pay its subcontractors as required under the Contract; (2) an accounting to determine where Brexton applied the money it received from Four Elyria for the project; (3) fraud based upon the allegedly false representations Ms. Beatty and Mr. Galvin made in the pay applications and Waiver and Release, which induced Four Elyria to pay the final pay applications;

---

[3] We note that M.J. Griffith Paving, Inc. filed a mechanic's lien on January 6, 2017. The record reflects that Brexton paid M.J. Griffith Paving several days later, and that lien was released.

and (4) slander of title based upon the allegedly false lien Brexton filed against Four Elyria's real estate title.

{¶23} Brexton counterclaimed against Four Elyria, asserting claims for: (1) breach of contract; (2) unjust enrichment; (3) declaratory judgment; and (4) foreclosure of Brexton's mechanic's lien. Those claims were based upon the following allegations, respectively: (1) Four Elyria breached the Contract by not paying Brexton for the Petco T.I. work, which was outside the scope of the Contract, but that Four Elyria assured Brexton it would pay; (2) alternatively, Brexton was entitled to compensation under the theory of unjust enrichment because it conferred a benefit upon Four Elyria by performing the Petco T.I. work, Four Elyria accepted that benefit, and it would be unjust for Four Elyria to retain that benefit without paying Brexton; (3) it was entitled to a declaration that it had no obligation to cure the mechanic's liens filed against Four Elyria's property for the Petco T.I. work when Brexton itself had not been paid for the work, and it was also entitled to a declaration that Brexton was entitled to file its own lien for the Petco T.I. work since it had not been paid for it; and (4) its lien for $499,321.19 was valid, entitling Brexton to foreclosure of that lien.

{¶24} Brexton also cross-claimed against several new defendants, including Protective, asserting that the new defendants have or may have claim interests in the property, and, therefore, were necessary parties to Brexton's claim to foreclose its mechanic's lien.

{¶25} Protective then filed a cross-claim against Brexton for declaratory judgment, seeking a declaration from the trial court that: (1) Brexton's lien affidavit was invalid and did not lawfully encumber the property; and (2) if Brexton's lien was valid, then Brexton's lien was subordinate to Protective's lien. Protective also counterclaimed against Four Elyria for breach of the loan documents and filed a third-party claim against Mr. Thomas for breach of the guaranty.

Protective alleged, in part, that Four Elyria breached the loan documents by falsely representing that no notice of commencement as to the property had been filed prior to the filing for the record of the mortgage, and by not bonding over or discharging Brexton's lien. Protective also alleged that Mr. Thomas breached the guaranty by falsely averring in the borrower's affidavit that he had no notice of any unpaid bills or liens against the property.

{¶26} After a period of discovery, the parties filed motions for summary judgment. We will briefly summarize each motion.

{¶27} Four Elyria filed three motions for summary judgment. First, it moved for summary judgment on its claims for breach of contract, fraud, and slander of title. In support of its motion, Four Elyria relied in part, upon the deposition testimony of Mr. Galvin, Ms. Beatty, and Mr. Pontia, as well as an affidavit by Mr. Thomas, all of which Four Elyria filed with the trial court.

{¶28} Regarding its breach of contract claim, Four Elyria argued that Brexton breached the Contract by not paying its subcontractors for the Petco T.I. work the subcontractors performed, and by not removing the corresponding mechanic's liens. Four Elyria argued that the Contract was unambiguous, and that the guaranteed maximum price under the Contract included the price for the Petco T.I. work.

{¶29} In support of its argument, Four Elyria cited the fact that the "Contract Documents" under the terms of the Contract included "drawings, specifications, [and] addenda issued and acknowledged prior to the execution" of the Contract. It cited the fact that the Prototype Plans were sent to Brexton prior to the execution of the Contract, and that the architect, Mr. Pontia, testified at his deposition that this was done for pricing purposes. It also cited Mr. Galvin's deposition testimony wherein he acknowledged that Brexton received the Prototype Plans prior to

the execution of the Contract. Four Elyria further cited the fact the Exhibit C to the Contract (i.e., the "Assumptions & Clarifications") referenced the completion date for Petco.

{¶30} Four Elyria also argued that the Contract required Brexton to notify Four Elyria in writing of any changes in the guaranteed maximum price, and to obtain a written change order before performing additional work, yet Brexton did neither. Four Elyria cited the deposition testimony of Mr. Galvin wherein he acknowledged that a change order should have been issued. Four Elyria maintained that it fully performed its obligations under the Contract by paying Brexton the guaranteed maximum price.

{¶31} Regarding its fraud claim, Four Elyria asserted that Brexton committed fraud by signing the Waiver and Release, which induced Four Elyria to pay Brexton in full, when Brexton knew it would be seeking additional money for work performed under the Contract.

{¶32} Regarding its slander of title claim, Four Elyria argued that Brexton slandered Four Elyria's title because it filed a mechanic's lien for work that it had already been paid for under the terms of the Contract.

{¶33} Second, Four Elyria moved for summary judgment on Brexton's counterclaims against it for breach of contract, unjust enrichment, declaratory judgment, and foreclosure of Brexton's mechanic's lien.

{¶34} Regarding Brexton's breach of contract counterclaim, Four Elyria argued that the Contract included the Petco T.I. work and that, even if Brexton disagreed, Brexton failed to notify Four Elyria in writing of any change to the guaranteed maximum price and failed to obtain a written change order. Four Elyria maintained that it fully performed under the Contract by paying Brexton in full, and that there was no breach on its part.

{¶35} Regarding Brexton's counterclaim for unjust enrichment, Four Elyria argued that Brexton did not provide a benefit other than what was provided for under the Contract, that Four Elyria was unaware that Brexton believed it was providing a benefit to Four Elyria outside of the Contract, and that it was just to allow Four Elyria to retain a benefit for which it paid under the terms of the Contract.

{¶36} Regarding Brexton's declaratory judgment and foreclosure counterclaims (i.e., that Brexton was entitled to a declaration that it had no obligation to cure the mechanic's liens filed against Four Elyria's property for the Petco T.I. work when Brexton itself had not been paid for the work, that it was also entitled to a declaration that Brexton was entitled to file its own lien for the Petco T.I. work since it had not been paid for it, and that its lien for $499,321.19 was valid, entitling Brexton to foreclosure of that lien) Four Elyria argued that, since Brexton's breach of contract claim failed as a matter of law, Brexton's declaratory judgment and foreclosure claims necessarily failed as a matter of law.

{¶37} Third, Four Elyria and Mr. Thomas moved for summary judgment on Protective's counterclaim against Four Elyria for breach of the loan documents, and Protective's third-party claim against Mr. Thomas for breach of the guaranty. Four Elyria/Mr. Thomas argued that Protective's claims were premised upon the success of Brexton's counterclaims and that, since Brexton's counterclaims failed as a matter of law, so too did Protective's claims. They argued that the representations Four Elyria/Mr. Thomas made in the loan documents were truthful and accurate when made, and that they had no duty to supplement those representations. Four Elyria/Mr. Thomas cited the fact that Brexton executed the Waiver and Release, and that Four Elyria/Mr. Thomas believed the Contract had been performed in full. Four Elyria/Mr. Thomas also argued that they had no obligation to disclose a notice of commencement for pre-existing improvements

that Protective was knowingly financing. Four Elyria/Mr. Thomas further argued that they were not required to bond over or discharge Brexton's lien because that lien was invalid, and they had the right to contest the lien under the terms of the loan documents.

{¶38} Protective filed a competing motion for summary judgment on its counterclaim against Four Elyria for breach of the loan documents, and on its third-party claim against Mr. Thomas for breach of the guaranty. In support of its motion, Protective relied, in part, upon the deposition testimony of Mr. Galvin, Mr. Giltz, and Mr. Thomas.

{¶39} Protective argued that the undisputed evidence demonstrated that Four Elyria and Mr. Thomas knew at the time they executed the loan documents and borrower's affidavit that Brexton and others were still seeking payment for construction services performed at Chestnut Commons. It argued that Four Elyria and Mr. Thomas knowingly misrepresented to Protective that no claims remained unpaid. In support of its argument, Protective cited emails dating back to November 30, 2016, that were exchanged between Four Elyria and Brexton and/or Brexton's subcontractors that, according to Protective, demonstrated that Four Elyria and Mr. Thomas were aware of several outstanding claims related to the work performed at Chestnut Commons at the time Four Elyria and Mr. Thomas executed the loan documents and the borrower's affidavit. It also argued that Four Elyria failed to bond over or discharge Brexton's mechanic's lien, as required by the terms of the loan documents.

{¶40} Protective also filed a motion for partial summary judgment against Brexton on Protective's cross-claim for declaratory judgment in which it sought a declaration that Protective's lien had priority over Brexton's lien.

{¶41} Brexton moved for partial summary judgment on its counterclaim against Four Elyria for unjust enrichment, and for summary judgment on Four Elyria's claims against it. In

support of its motion, Brexton relied, in part, upon the deposition testimony of Mr. Giltz, Mr. Pontia, and Mr. Galvin.

{¶42} In its briefing, Brexton asserted that "[t]he heart of the dispute between the parties is that Brexton performed additional work on the Project that was outside the scope of the parties' contract * * *, and as a result, Brexton is entitled to compensation over and above what is required under the Contract." It asserted that the entire dispute could be resolved by deciding one legal issue, that is, the scope of the work under the Contract. It asserted that it did not agree to perform the work shown on the final, site-specific Petco tenant improvement plans when it executed the Contract, that it later completed the work at Four's Elyria's direction, but that Four Elyria had refused to pay Brexton for that work.

{¶43} Brexton argued that the Contract was unambiguous, and that everyone involved understood that, if Brexton performed additional work, Brexton would be entitled to compensation above what was provided for under the terms of the Contract. Brexton also argued that everyone involved understood that the Petco T.I. work was to be completed under a separate contract, and that it would be priced once the site-specific Petco tenant improvement plans were finalized.

{¶44} In support of its position, Brexton cited Mr. Pontia's "Project Note[]" on the first page of the "Final Site Development Plans[,]" which stated that "The Project Consists of Shell Building and Landlords T.I. Work. Tenants Interior T.I. Work to be Submitted under Separate Contract * * *." It also cited the fact that the Prototype Plans specifically indicated that they were "For Design Intent Only and Shall Not be Used for Construction Purposes." It further cited Mr. Pontia's deposition testimony wherein he acknowledged that contractors cannot be expected to "issue binding pricing[,]" or build off of, prototype drawings.

{¶45} Brexton also asserted that it had discussed with Four Elyria the option for Four Elyria to pay for the Petco T.I. work outside of the Contract, which had been the past practice on other projects between Brexton and the owners of Four Elyria. To that end, Brexton asserted that it had been past practice on other projects for the owners of Four Elyria to instruct Brexton not to submit a change order in exchange for a promise that the owners would pay for the work outside of the contracts.

{¶46} The parties filed briefs in opposition and replies in support of their respective motions for summary judgment. The trial court then ruled upon the parties' motions for summary judgment in one judgment entry.

{¶47} In its judgment entry, the trial court first addressed Four Elyria's motion for summary judgment on its claims against Brexton for breach of contract, fraud, and slander of title, as well as its motion for summary judgment on Brexton's counterclaim for breach of contract. The trial court concluded that Brexton, not Four Elyria, was entitled to summary judgment on Four Elyria's claims, and that Four Elyria was entitled to summary judgment on Brexton's counterclaim for breach of contract.

{¶48} In rendering its decision, the trial court indicated that the dispute centered upon whether the Petco T.I. work Brexton performed was within the scope of the Contract. It concluded that it was not. The trial court explained that the Contract (and four change orders unrelated to the Petco T.I. work) was the only agreement between the parties, that it contained an integration clause, and that neither the final, site-specific Petco tenant improvement plans nor the Protype Plans were listed on Exhibit A. The trial court explained that the Prototype Plans were not site-

specific, were not referenced in the Contract, and contained a disclaimer stating that they were not intended to be used for construction or pricing.[4]

{¶49} The trial court also explained that the final Petco T.I. plans could not have been listed on Exhibit A because they were not in existence until over three months after the parties executed the Contract. The trial court further explained that the "cover page of the Contract clearly establishes that the tenant interior work was to be submitted under a separate contract."[5]

{¶50} In light of its conclusion that the Petco T.I. work was outside the scope of the Contract, the trial court concluded that each party's breach of contract claim failed as a matter of law. In reaching this conclusion, the trial court did not address Four Elyria's argument that the Petco T.I. work was included in the Contract because the Prototype Plans were "issued and acknowledged" prior to the execution of the Contract. The trial court also did not address Four Elyria's argument that, even if the Petco T.I. work was not included in the Contract (which Four Elyria disputed), the Contract still required Brexton to notify Four Elyria in writing of any increase in the guaranteed maximum price, to submit a change order, and – if the parties disagreed as to whether certain work was within the scope of the Contract – to furnish Four Elyria with a cost estimate for the disputed work.

{¶51} The trial court then concluded that Four Elyria's fraud claim failed as a matter of law because the Waiver and Release Brexton executed referred to work performed under the Contract only. It further concluded that Four's Elyria's slander-of-title claim failed as a matter of

---

[4] As discussed in this Court's resolution of Four Elyria's first assignment of error, the disclaimer did not mention pricing. The trial court's decision appears to rely on the deposition testimony of Mr. Pontia to support its conclusion that the Prototype Plans were not intended to be used for pricing purposes.

[5] As discussed in this Court's resolution of Four Elyria's first assignment of error, the language the trial court is referring to is not on the cover page of the Contract. It is on the cover page of Mr. Pontia's "Final Site Development Plans[.]"

law because the mechanic's lien that was the basis for that claim was filed to secure payment for the Petco T.I. work, not for work performed under the Contract.

{¶52} Next, the trial court addressed Brexton's motion for summary judgment on its claim against Four Elyria for unjust enrichment. The trial court explained that the law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject. It then reiterated that the Petco T.I. work was outside the scope of the Contract. Applying the law governing unjust enrichment, the trial court concluded that Brexton conferred a benefit on Four Elyria, that Four Elyria knew of the benefit, and that it would be unjust for Four Elyria to retain that benefit without compensating Brexton. Accordingly, it concluded that Brexton was entitled to judgment as a matter of law on its unjust enrichment claim, granted Brexton's motion for partial summary judgment on that claim, and denied Four Elyria's competing motion.[6]

{¶53} Next, the trial court addressed Protective's motion for summary judgment on its counterclaim against Four Elyria for breach of the loan documents and its third-party claim against Mr. Thomas for breach of the guaranty, as well as Four Elyria and Mr. Thomas's competing motion. The trial court explained that Four Elyria and Protective entered into a mortgage loan to refinance Four Elyria's construction financing for Chestnut Commons. It explained that the loan documents consisted of a promissory note, an open-ended mortgage, an assignment of rents, and a guaranty. The trial court also explained that Mr. Thomas signed a borrower's affidavit.

{¶54} The trial court noted that, between November 30, 2016, and the effective date of the mortgage (i.e., March 27, 2017), Mr. Giltz received multiple communications, including

---

[6] Brexton later dismissed its counterclaim and cross-claim for declaratory judgment, and released its lien.

emails, regarding subcontractors that remained unpaid for the work they performed on Chestnut Commons. The trial court found that Mr. Giltz's knowledge of these emails was imputed to Four Elyria and Mr. Thomas.

{¶55} The trial court then noted that the Brexton lien remained unpaid despite Protective's demands to Four Elyria to bond over or discharge the lien, per the terms of the loan documents. The trial court concluded that no genuine issue of material fact existed with respect to Protective's counterclaim against Four Elyria for breach of loan documents, nor with Protective's third-party claim against Mr. Thomas for breach of the guaranty. Accordingly, it granted Protective's motion for summary judgment against Four Elyria and denied Four's Elyria's competing motion.

{¶56} The trial court then addressed Protective's motion for summary judgment against Brexton on Protective's cross-claim against Brexton for lien priority. Applying Revised Code Section 1311.14, the trial court found that Protective's mortgage lien had priority over Brexton's mechanic's lien. Accordingly, it found that no genuine issue of material fact remained on this issue, and that Protective was entitled to summary judgment on its cross-claim for lien priority against Brexton.

{¶57} The matter then proceeded to a damages trial on Brexton's claim for unjust enrichment. The jury returned a verdict in the amount of $465,417.44. Brexton then dismissed its claim for declaratory judgment and released its lien.

{¶58} Four Elyria and Brexton then both moved for attorney's fees in connection with their defense of the other party's breach of contract claim. The trial court denied both motions.

{¶59} Protective then filed a motion for attorney's fees under seal, seeking the attorney's fees it was entitled to under the terms of the loan documents. Some of those fees, it argued, were incurred on its behalf by Protective's title insurer, First American Title Insurance ("First

American"), who retained Squire Patton Boggs in connection with the lien priority claim. Protective argued that, per the subrogation language contained in the title policy between Protective and First American, First American was entitled to "step into Protective's shoes and recoup its fees as well."

{¶60} Four Elyria filed a brief in opposition to Protective's motion for attorney's fees. After a hearing on the matter, the trial court issued a judgment entry finding that Four Elyria and Mr. Thomas were jointly and severally liable for Protective's attorney's fees, which totaled $251,570.31. In doing so, the trial court noted that $84,760.81 was attributable to Squire Patton Boggs ("representing the interest of the title insurer, First American") and $166,809.50 was attributable to Calfee, Halter & Griswold ("the principal litigator for Protective").

{¶61} Four Elyria appealed and Brexton cross-appealed in case number 20CA011695. Mr. Thomas appealed in case number 20CA011694. This Court consolidated the appeals for purposes of decision only. Because Four Elyria's fifth and sixth assignments of error in case number 20CA011695 are almost identical to Mr. Thomas's assignments of error in case number 20CA011694, this Court will address those assignments of error together in our review of case number 20CA011694. This Court will address case number 20CA011695 first.

II.

FOUR ELYRIA'S ASSIGNMENT OF ERROR I - CASE NO. 20CA011695

THE TRIAL COURT ERRED BY FINDING THE PETCO T.I. WAS NOT INCLUDED IN THE GUARANTEED MAXIMUM PRICE AGREEMENT WHEN THE INITIAL PLANS AND SPECIFICATIONS WERE PROVIDED TO THE CONSTRUCTION MANAGER IN ADVANCE OF THE GMP AND BY FINDING THAT BREXTON DID NOT BREACH THE GMP WHEN IT FAILED TO PAY ITS SUBCONTRACTORS' LIENS AND FILED ITS OWN LIEN.

{¶62} In its first assignment of error, Four Elyria argues that the trial court erred by finding that the Petco T.I. work was not included in the Contract and by finding that Brexton did not breach

the Contract when it failed to pay its subcontractors' liens and filed its own lien. It argues that this Court should reverse the trial court's decision, enter judgment in favor of Four Elyria on its breach of contract claim, and remand the case for a hearing on Four Elyria's damages.

{¶63} This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Pursuant to Civil Rule 56(C), summary judgment is proper if:

> (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

{¶64} The party moving for summary judgment bears the initial burden of demonstrating the absence of genuine issues of material facts concerning the essential elements of the non-moving party's case. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). Specifically, the moving party must support the motion by pointing to some evidence in the record of the type listed in Civil Rule 56(C). *Id.* at 292-293. If the moving party satisfies this burden, then the non-moving party has the reciprocal burden to demonstrate a genuine issue for trial remains. *Id.* at 293. The non-moving party may not rest upon the mere allegations or denials in her pleadings, but must point to or submit evidence of the type specified in Civil Rule 56(C). *Id.*; Civ.R. 56(E).

{¶65} This Court reviews a trial court's interpretation of a contract de novo. *Kallas v. Manor Care of Barberton, OH, L.L.C.*, 9th Dist. Summit No. 28068, 2017-Ohio-76, ¶ 8. "[A] contract is to be read as a whole and the intent of each part gathered from a consideration of the whole." *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, ¶ 16; *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, ¶ 37 ("We will examine the contract as

a whole and presume that the intent of the parties is reflected in the language of the contract."). "If it is reasonable to do so, [courts] must give effect to each provision of the contract." *Saunders* at ¶ 16.

{¶66} "[T]he meaning of any particular construction contract is to be determined on a case-by-case and contract-by-contract basis, pursuant to the usual rules for interpreting written instruments." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997). "The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Id.* quoting *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus. "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 15 Ohio St.3d 321, 322 (1984).

{¶67} Four Elyria asserts several arguments in support of its first assignment of error. It argues that the Contract was not ambiguous, and that it always included the Petco T.I. work regardless of the fact that the final, site-specific drawings were not provided to Brexton until several months after the parties executed the Contract. Four Elyria cites the fact that Exhibit C to the Contract, titled "Assumptions & Clarifications[,]" stated: "Completion date for Petco to be 08/27/16." Four Elyria also relies upon several provisions in the Contract to support its position that the Petco T.I. work was within the scope of the Contract. These include: (1) Section 2.3.4. defining "Contract Documents" to include the "existing Contract Documents listed in section 15.1" and "modifications issued in accordance with" the Contract; (2) Section 2.3.27, defining "Work" to include "construction and services necessary or incidental to fulfill [Brexton's] obligations for the Project in conformance with [the Contract] and other Contract Documents.";

(3) "Article 3 Construction Manager's Responsibilities," requiring Brexton to: (a) update the schedule of work regarding the issuance of drawings and specifications as the design proceeds; (b) notify and make recommendations to Four Elyria if any estimate exceeds a previously approved estimate; (c) "be responsible for paying all costs of completing the Work which exceed the [guaranteed maximum price]" after the parties have agreed that the drawings and specifications are sufficiently complete; (d) promptly notify Four Elyria if any revised drawings and specifications are inconsistent with the Contract's clarifications, assumptions, and allowances; and (e) "provide in the [Contract] for further development of the Contract Documents" if the "'Contract Documents' are not complete at the time the [guaranteed maximum price] proposal is submitted to [Four Elyria.]"

{¶68} Relying on the latter, Four Elyria argues that, if the Contract Documents were incomplete when Brexton gave Four Elyria its all-in price for the project, then Brexton was required to warn Four Elyria, which it did not. Four Elyria also argues that, if the final, site-specific Petco drawings included work beyond the scope of the Contract, then Brexton was required to request a written change order, which it did not.

{¶69} Four Elyria also argues that Brexton's compensation for the project was limited to the guaranteed maximum price, that Brexton was not required to perform additional work absent a change order, and that its acceptance of final payment waived any unsettled claims. It further argues that, if the parties disagreed as to whether certain work was within the scope of the Contract, the Contract explicitly stated that Brexton was required to furnish Four Elyria with a cost estimate for the disputed work.

{¶70} As previously noted, in reaching its decision, the trial court did not address Four Elyria's argument that the Petco T.I. work was included in the Contract because the Prototype

Plans were "issued and acknowledged" prior to the execution of the Contract. The trial court also did not address Four Elyria's argument that, even if the Petco T.I. work was not included in the Contract (which Four Elyria disputed), the Contract still required Brexton to notify Four Elyria in writing of any increase in the guaranteed maximum price (i.e., Section 9.4), to submit a formal change order if changes in the work impacted the guaranteed maximum price (i.e., Section 9.1.1), and – if the parties disagreed as to whether certain work was within the scope of the Contract – to furnish Four Elyria with a cost estimate for the disputed work (i.e., Section 9.3.3). Instead, the trial court essentially found that, because neither the Prototype Plans nor the final, site-specific Petco plans were expressly incorporated into the Contract, the Petco T.I. work, as a matter of law, was not part of the Contract and, consequently, the Contract had no application in this case.

{¶71} The trial court's judgment entry puts this Court in the position of having to analyze Four Elyria's arguments, as well as the numerous Contract provisions upon which it relies, in the first instance. This Court will not do so for the first time on appeal because that is not the function of a reviewing court.[7] *See Steven A. Ettinger, Inc. v. Kramer*, 9th Dist. Summit No. 29848, 2021-

---

[7] While not dispositive of the issues before this Court, aspects of the trial court's judgment entry appear inconsistent with the record. For example, as part of its reasoning, the trial court emphasized that the "cover page of the Contract clearly establishes that the tenant interior work was to be submitted under a separate contract." By "cover page of the Contract[,]" however, the trial court is referring to Mr. Pontia's (the architect) "Project Note[]" on the cover page of the "Final Site Development Plans[.]" According to Mr. Pontia's deposition testimony, his "Project Note[]" was not intended to refer to the Contract, which he was not a party to and had never read. He testified that by "contract" he meant the contract between Pontia Architecture and Four Elyria.

Additionally, the trial court cited Mr. Pontia's deposition testimony to support its conclusion that the Prototype Plans were not to be used for pricing purposes. While Mr. Pontia did generally testify that he would not expect a contractor to "issue binding pricing" based on prototype plans, he also made clear that he sent the Prototype Plans to Brexton "for pricing purposes[.]" Moreover, the trial court appears to have found the Contract unambiguous, yet relies upon extrinsic evidence (i.e., deposition testimony) to support its reasoning. *Grubb & Assoc., LPA v. Sandor*, 9th Dist. Summit No. 29089, 2019-Ohio-128, ¶ 9, quoting *Summit Retirement Plan Servs., Inc. v. Bergdorf*, 9th Dist. Summit No. 23200, 2006-Ohio-6154, ¶ 12. ("When contractual

Ohio-2219, ¶ 17; *Ocwen Loan Servicing, LLC v. McBenttes*, 9th Dist. Summit No. 29343, 2019-Ohio-4884, ¶ 8-9 (reversing and remanding the matter because the trial court's judgment entry did not address certain arguments made in the summary-judgment briefing). We, therefore, reverse and remand the matter so that the trial court can set forth an analysis that permits our review. *Ettinger* at ¶ 17. Four Elyria's first assignment of error is sustained on that basis.

{¶72} We note that the trial court's conclusion that the Petco T.I. work was outside the scope of the Contract affected its subsequent rulings, including its rulings on Four Elyria's remaining claims and Brexton's counterclaim for unjust enrichment. As noted in our disposition of Four Elyria's remaining assignments of error and Brexton's cross-assignment of error below, any review of those rulings is now premature.

FOUR ELYRIA'S ASSIGNMENT OF ERROR II - CASE NO. 20CA011695

THE TRIAL COURT ERRED IN GRANTING BREXTON SUMMARY JUDGMENT. ASSUMING THIS COURT DISAGREES WITH FOUR ELYRIA'S FIRST ASSIGNMENT OF ERROR AND FINDS THE PARTIES' AGREEMENT AMBIGUOUS, IT MUST CONSIDER ALL RELEVANT EVIDENCE TO ASCERTAIN THE PARTIES' INTENT WHICH IS A GENUINE ISSUE OF FACT FOR THE JURY.

{¶73} In its second assignment of error, Four Elyria argues that the trial court erred by granting summary judgment in favor of Brexton on Brexton's counterclaim for unjust enrichment.

---

language is clear and unambiguous, courts must look to the express language of the contract to determine the intent of the parties and 'interpret it according to its plain, ordinary, and common meaning.'").

Further, the trial court concluded that "[t]here is no reference to the Petco improvement work in the Contract[,]" yet Mr. Galvin acknowledged during his deposition that some of the tenant improvements for the Petco space were contained within Exhibit A to the Contract. Moreover, the trial court's decision does not acknowledge that Exhibit C to the Contract referred to the completion of Petco.

While not intended as an exhaustive list, the above-mentioned issues highlight some concerning aspects of the judgment entry.

In light of this Court's disposition of Four Elyria's first assignment of error, we decline to address Four Elyria's second assignment of error. Four Elyria's second assignment of error is overruled on that basis.

FOUR ELYRIA'S ASSIGNMENT OF ERROR III - CASE NO. 20CA011695

FOUR ELYRIA IS ENTITLED TO SUMMARY JUDGMENT ON ITS SLANDER OF TITLE AND FRAUD CLAIMS BECAUSE BREXTON CFO'S UNDISPUTED TESTIMONY SHOWS THAT BREXTON WRONGFULLY RECORDED A MECHANIC'S LIEN ON THE PROPERTY AFTER SECURING ITS FINAL PAYMENT ON THE PLAZA AND ATTESTING THAT BREXTON WAS PAID IN FULL UNDER THE GMP AGREEMENT.

{¶74} In its third assignment of error, Four Elyria argues that the trial court erred by denying its motion for summary judgment on its claims against Brexton for slander of title and fraud. In light of this Court's disposition of Four Elyria's first assignment of error, we decline to address Four Elyria's third assignment of error. Four Elyria's third assignment of error is overruled on that basis.

FOUR ELYRIA'S ASSIGNMENT OF ERROR IV - CASE NO. 20CA011695

THE TRIAL COURT ERRED APPLYING UNJUST ENRICHMENT WHEN THE PARTIES HAD A WRITTEN AGREEMENT GOVERNING THEIR RELATIONSHIP. IT ALSO ERRED BY EXCLUDING EVIDENCE AT THE DAMAGES TRIAL ABOUT THE VALUE OF THE SERVICES PROVIDED BY BREXTON.

{¶75} In its fourth assignment of error, Four Elyria argues that the trial court erred by applying unjust enrichment when the Contract governed the parties' relationship and the underlying dispute. It also argues that the trial court erred by excluding its expert witness's testimony at the damages hearing. In light of this Court's disposition of Four Elyria's first assignment of error, we decline to address Four Elyria's fourth assignment of error. Four Elyria's fourth assignment of error is overruled on that basis.

BREXTON'S CROSS-ASSIGNMENT OF ERROR - CASE NO. 20CA011695

THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO AWARD BREXTON ITS ATTORNEYS' FEES EXPENDED IN DEFENDING FOUR ELYRIA'S BREACH OF CONTRACT CLAIMS.

{¶76} In its cross-assignment of error, Brexton argues that the trial court abused its discretion by failing to award Brexton the attorney's fees it expended in defending against Four Elyria's breach of contract claims. In support of its argument, Brexton relies upon Section 13.5.1 of the Contract, which provides that "[t]he costs of any binding dispute resolution procedures and reasonable attorneys' fees shall be borne by the non-prevailing Party, as determined by the adjudicator of the dispute." Brexton asserts that the trial court ruled in its favor when it granted its motion for summary judgment on the claims raised against it in Four Elyria's complaint. It, therefore, concludes that it was the prevailing party under the terms of the Contract, that it was entitled to reasonable attorney's fees, and that the trial court abused its discretion by summarily denying its motion for attorney's fees.

{¶77} In response to Brexton's cross-assignment of error, Four Elyria asserts that both parties asserted a breach of contract claim against the other party, and that the trial court overruled both parties' motions for summary judgment on those claims. As a result, it argues, neither party was a "prevailing" party and, accordingly, neither party was entitled to attorney's fees relative to its breach of contract claim.

{¶78} In light of this Court's disposition of Four Elyria's first assignment of error, we decline to address Brexton's cross-assignment of error. Brexton's cross-assignment of error is overruled on that basis.

FOUR ELYRIA'S ASSIGNMENT OF ERROR V - CASE NO. 20CA011695

THE TRIAL COURT ERRED AS A MATTER OF LAW BY FINDING FOUR ELYRIA/THOMAS BREACHED THE PROTECTIVE LOAN DOCUMENTS

AND GUARANTY. * * * A PLAIN READING OF THE AGREEMENTS AND THE OPERABLE FACTS SUPPORT THE OPPOSITE CONCLUSION – THERE WAS NO BREACH.

THOMAS'S ASSIGNMENT OF ERROR V - CASE NO. 20CA011694

THE TRIAL COURT ERRED AS A MATTER OF LAW BY FINDING FOUR ELYRIA/THOMAS BREACHED THE PROTECTIVE LOAN DOCUMENTS AND GUARANTY. * * * A PLAIN READING OF THE AGREEMENTS AND THE OPERABLE FACTS SUPPORT THE OPPOSITE CONCLUSION – THERE WAS NO BREACH.

{¶79} As noted above, this Court will address Four Elyria's fifth and sixth assignments of error in case number 20CA011695 together with Mr. Thomas's assignments of error in case number 20CA011964. We note that Mr. Thomas has numbered his assignments of error to align with Four Elyria's corresponding assignments of error in case number 20CA011695.

{¶80} In their fifth assignments of error, Four Elyria/Mr. Thomas argue that the trial court erred by finding that Four Elyria breached the Protective loan documents, and that Mr. Thomas breached the guaranty. As a result, they argue, the trial court erred by granting summary judgment in favor of Protective on those claims, and that it should have instead granted summary judgment in favor of Four Elyria/Mr. Thomas.

{¶81} This Court applies the same summary-judgment standard of review set forth in our analysis of Four Elyria's first assignment of error. Protective's counterclaim against Four Elyria for breach of the loan documents is a claim for breach of contract. "The elements for claim for breach of contract include the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Skycasters, LLC v. Kister*, 9th Dist. Summit No. 29660, 2021-Ohio-4154, ¶ 42. Regarding Protective's third-party claim against Mr. Thomas for breach of the guaranty, "a guarantor's liability * * * is governed by the terms used in the contract." *O'Brien v. Ravenswood Apts, Ltd.*, 169 Ohio App.3d 233, 2006-Ohio-5264, ¶ 23 (1st

Dist.). "The guaranty agreement is interpreted as any other contract under Ohio law." *Id.* Accordingly, our review is de novo. *Kallas*, 2017-Ohio-76, at ¶ 8.

**{¶82}** As previously noted, Four Elyria and Mr. Thomas executed loan documents and a borrower's affidavit related to the refinancing of Chestnut Commons through Protective on February 13, 2017. The loan documents included: (1) a promissory note; (2) an open-ended mortgage and security agreement; (3) an assignment of rents and leases; and (4) a guaranty signed by Mr. Thomas. Mr. Thomas also executed a borrower's affidavit. The effective date of those documents was listed as March 27, 2017, the day the loan closed.

**{¶83}** Under the terms of the mortgage, providing an untrue representation in the borrower's affidavit constituted an event of default. The mortgage also provided that "Borrower shall promptly bond over or discharge any mechanics', laborers', materialmen's or similar lien * * * filed or recorded which relates to Borrower of the Property." The promissory note provided that Four Elyria and Mr. Thomas shall have personal liability for any damage, liability, costs, and expenses that Protective may suffer directly or indirectly arising out of fraud or misrepresentation by Four Elyria or Mr. Thomas prior to or during the term of the loan. The guaranty provides the Mr. Thomas shall have personal liability for any costs incurred due to fraud or misrepresentation by Four Elyria or Mr. Thomas prior to or during the term of the loan.

**{¶84}** Four Elyria/Mr. Thomas argue that the trial court erred by finding that Four Elyria/Mr. Thomas made misrepresentations at the time they executed the loan documents and borrower's affidavit based upon their purported knowledge of Brexton's subcontractors' claims of nonpayment. Four Elyria/Mr. Thomas present several sub-arguments in support of their position, including: (1) Mr. Glitz's knowledge of the subcontractors' claims cannot be imputed on Mr. Thomas and, as a result, Mr. Thomas cannot be held personally liable as the guarantor; (2) the

emails the trial court relied upon regarding unpaid subcontractors did not demonstrate that Four Elyria/Mr. Thomas made misrepresentations at the time they executed the loan documents and borrower's affidavit (i.e., on February 13, 2017) because those emails demonstrated that payment was forthcoming consistent with the ordinary course of business; (3) Brexton had executed the Waiver and Release, indicating it had been paid in full; (4) Four Elyria/Mr. Thomas had no duty to supplement their representations between the time they executed the loan documents (i.e., on February 13, 2017) and the effective date of those documents (i.e., on March 27, 2017); and (5) assuming this Court rejects the foregoing arguments, a question of fact exists at to what Mr. Giltz knew as of February 13, 2017.

**{¶85}** Four Elyria also argues that the trial court erred by finding that it breached the loan documents by failing to discharge Brexton's lien. It argues that it had a right to contest Brexton's lien under the terms of the loan documents, and that the duty to bond over or discharge the lien only applied to liens arising out the property's operation, not construction liens. Four Elyria concludes that the trial court erred by granting summary judgment in favor of Protective on these claims, and that it instead should have granted summary judgment in favor of Four Elyria.

**{¶86}** Initially, we note that Protective's claims against Four Elyria and Mr. Thomas are not dependent on the validity or success of Brexton's claims against Four Elyria. While the loan documents do provide that Four Elyria has a right to contest any liens filed against its property, the loan documents do not condition Four Elyria's obligation to bond over any liens filed against Chestnut Commons based upon those liens being valid.

**{¶87}** In the borrower's affidavit, Mr. Thomas averred, in part, that he had no "notice of any unpaid bills or claims for labor or services performed or materials furnished with respect to the Property[,]" and that there were "no outstanding indebtedness or liens against the Property[.]"

On February 21, 2017, after Four Elyria and Mr. Thomas executed the loan documents but before the effective date of those documents (i.e., March 27, 2017), Brexton submitted a spreadsheet of cost overages to Four Elyria. Additionally, the record reflects that Mr. Giltz received several communications regarding subcontractors that had not been paid for the work they performed at Chestnut Commons. Those communications dated back to November 30, 2016, several months before Four Elyria and Mr. Thomas executed the loan documents. While Mr. Giltz testified that he assumed Brexton was handling the situation and that the subcontractors were being paid in due course, the record reflects otherwise. Moreover, we are unpersuaded by Four Elyria's argument that Mr. Giltz's knowledge cannot be imputed on Mr. Thomas, who signed the loan documents on behalf of Four Elyria, and who signed the guaranty on his own behalf. *See Fin. Freedom Acquisition, LLC v. Heirs of Thomas*, 2d Dist. Montgomery No. 25047, 2012-Ohio-3845, ¶ 8 ("The knowledge or notice to the agent is imputed to the principal regardless of whether the agent has, in fact, communicated his knowledge to his principal.").

{¶88} Additionally, Protective sent a notice of default to Four Elyria based upon Four Elyria's failure to bond over Brexton's lien. Notwithstanding, Four Elyria did not bond over Brexton's lien. The unambiguous language of the mortgage provides that "Borrower shall promptly bond over or discharge any mechanics', laborers', materialmen's or similar lien * * * filed or recorded which relates to Borrower of the Property." This language, while contained in a section that addresses the operation of the property, required Four Elyria to bond over "any * * * lien" related to the property.

{¶89} Having reviewed the record, this Court concludes that the trial court did not err when it granted Protective's motion for summary judgment on its counterclaim against Four Elyria for breach of the loan documents, and on its third-party claim against Mr. Thomas for breach of

the guaranty. Four Elyria and Mr. Thomas's fifth assignments of error in case numbers 20CA011694 and 20CA011695 are overruled.

FOUR ELYRIA'S ASSIGNMENT OF ERROR VI - CASE NO. 20CA011695

THE AWARD OF DUPLICATE ATTORNEY'S FEES TO A NONPARTY IS WHOLLY UNREASONABLE AND CONTRARY TO LAW. THE TRIAL COURT ERRED BY AWARDING PROTECTIVE $84,760.81 IN ATTORNEY FEES FOR ITS INSURER THAT WERE NOT "INCURRED BY" PROTECTIVE CONTRARY TO LAW AND THE LOAN DOCUMENTS.

THOMAS'S ASSIGNMENT OF ERROR VI - CASE NO. 20CA011694

THE AWARD OF DUPLICATE ATTORNEY'S FEES TO A NONPARTY IS WHOLLY UNREASONABLE AND CONTRARY TO LAW. THE TRIAL COURT ERRED BY AWARDING PROTECTIVE $84,760.81 IN ATTORNEY FEES FOR ITS INSURER THAT WERE NOT "INCURRED BY" PROTECTIVE CONTRARY TO LAW AND THE LOAN DOCUMENTS.

{¶90} In their sixth assignments of error, Four Elyria/Mr. Thomas assert that the trial court erred by awarding Protective attorney's fees incurred by its title insurance company, First American.

{¶91} "When the right to recover attorney fees arises from a stipulation in a contract, the rationale permitting recovery is the 'fundamental right to contract freely with the expectation that the terms of the contract will be enforced.'" *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, ¶ 8, quoting *Nottingdale Homeowners' Assn, Inc. v. Darby*, 33 Ohio St.3d 32, 36 (1987). Whether a contract permits the recovery of attorney's fees is a matter of contract interpretation, which we review de novo. *See Woodside Mgt. Co. v. Bruex*, 9th Dist. No. 29179, 2020-Ohio-4039, ¶ 141. An award of attorney's fees, however, is reviewed for an abuse of discretion. *Baaron, Inc. v. Davidson*, 9th Dist. Wayne No. 16AP0052, 2017-Ohio-7783, ¶ 4. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶92} Four Elyria/Mr. Thomas present three arguments in support of their position that the trial court erred by awarding Protective attorney's fees incurred by its title insurance company, First American. First, they argue that the loan documents provide for reasonable attorney's fees incurred by the lender (i.e., Protective), not the lender's title insurer. Second, they argue that many of the fees incurred by First American duplicate those incurred by Protective, which is unreasonable. For example, they argue that an attorney for Protective and an attorney for First American were present at several depositions, which was unnecessary. They also argue that the legal issues involved were not novel and did not warrant the amount of fees incurred in this case. Third, Four Elyria/Mr. Thomas argue that, prior to the trial court granting summary judgment in favor of Protective, they had no notice that Protective would be seeking attorney's fees on behalf of First American based upon First American's right to subrogation. Relatedly, Four Elyria/Mr. Thomas argue that if Protective wanted to pursue a subrogation claim, First American should have been joined as a party.

{¶93} In response, Protective argues that the trial court did not award attorney's fees to First American. It argues that the trial court awarded fees to Protective, and that First American's right to subrogation under the terms of the title insurance policy entitled First American to a portion of those fees. It argues that First American retained Squire Patton Boggs to defend Protective's lien priority interests and, therefore, those attorney's fees were incurred by Protective regardless of the fact that First American paid those fees pursuant to its title insurance policy with Protective.

{¶94} Protective also argues that its primary counsel (Calfee, Halter & Griswold) and lien priority counsel (Squire Patton Boggs) were defending separate, distinct legal issues, and that this did not amount to those attorneys performing duplicate work. It also argues that Four Elyria complicated this matter by failing to bond over Brexton's lien, which caused Protective to incur

legal fees. It further argues that Four Elyria/Mr. Thomas have waived the issue of joinder because they did not raise that issue below. In their reply brief, Four Elyria/Mr. Thomas argue that they did not waive the issue of joinder because they raised the fact that First American was not a party to this action in their brief in opposition to Protective's motion for attorney's fees.

{¶95} The promissory note Four Elyria/Mr. Thomas executed states: "Borrower agrees that if, and as often as, this Note is given to an attorney for collection or to defense or enforce any of Lender's rights hereunder, Borrower will pay to Lender its attorneys' fees, together with all court costs and other expenses paid of incurred by Lender." It also provides that "All Lender's attorneys' fees which Borrower agrees to pay under this Note and any of the other Loan Documents shall be the reasonable fees incurred by Lender." The guaranty Mr. Thomas executed states that "Guarantor agrees to pay Lender's out-of-pocket costs and expenses, including but not limited to legal fees and disbursements, incurred in any effort to collect or enforce any of the Secured Debt or this Guaranty, whether or not any lawsuit is filed."

{¶96} This Court's review of the loan documents indicates that Protective was entitled to the reasonable attorney's fees it incurred with respect to its claims against Four Elyria/Mr. Thomas for breach of the loan documents and breach of the guaranty, as well as its lien-priority claim. Despite Four Elyria/Mr. Thomas's argument to the contrary, the trial court's judgment entry indicates that it awarded attorney's fees to Protective, not to First American. In its analysis, the trial court noted that some of those fees were attributable to Squire Patton Boggs, which represented the interest of the title insurer, First American. The trial court combined those fees with the fees attributable to Calfee, Halter & Griswold to reach a total of $251,570.31. The fact that First American's title policy with Protective entitles First American to some of those fees does not change the fact that those fees were incurred on behalf of Protective.

{¶97} Moreover, "while a 'plaintiff may bring a suit for the entire amount of [its] damages solely in [its] own name, despite having assigned at least a portion of [its] loss to [its] insurer' the 'assignee insurer must be joined in the action if the plaintiff or tortfeasor raise the issue of joinder.'" *Bell v. Nichols*, 10th Dist. Franklin No. 10AP-1036, 2013-Ohio-2559, ¶ 58, quoting *Banford v. State Farm Ins. Co.*, 2d Dist. Montgomery No. 18464, 2001 WL 703858, *6 (Jun. 22, 2001). "[I]f joinder is not raised by any party, the plaintiff still retains ownership of the claim for damages and may maintain the suit for all damages in her own name." *Banford* at *6, citing *Holibaugh v. Cox*, 167 Ohio St. 340 (1958), paragraph one of the syllabus; *Setters v. Durrani*, 1st Dist. Hamilton No. C-190341, 2020-Ohio-6859, ¶ 53-58. Here, while Four Elyria/Mr. Thomas did point out in their briefing below that First American was not a party to this lawsuit, they did not specifically raise the issue of joinder, nor have they pointed this Court to any other affirmative action they took to pursue that defense. *Setters* at ¶ 57 ("[A] party waives the right to claim a necessary party was not joined when it does not take affirmative action to pursue that defense.").

{¶98} Regarding the reasonableness of the trial court's award, the trial court found that the complexity of the case rendered the award reasonable, appropriate, and necessary. Four Elyria/Mr. Thomas's primary argument as to why the award was unreasonable is that attorneys from both firms attended some of the depositions, and that the issues involved were not novel or complex. But, as Protective argues in its merit brief, those attorneys were defending separate, distinct legal issues, which required eliciting certain factual information during the depositions. This Court cannot say that Four Elyria/Mr. Thomas have established that the trial court abused its discretion in its award of attorney's fees to Protective. *State v. Mastice*, 9th Dist. Wayne No. 06CA0050, 2007-Ohio-4107, ¶ 7, citing App.R. 16(A)(7) ("An appellant has the burden of demonstrating error on appeal.").

**{¶99}** In light of the foregoing, Four Elyria/Mr. Thomas's sixth assignments of error in case numbers 20CA011694 and 20CA011695 are overruled.

## III.

**{¶100}** Four Elyria's first assignment of error in case number 20CA011965 is sustained. Four Elyria's second, third, fourth, fifth and sixth assignments of error in case number 20CA011965 are overruled. Brexton's cross-assignment of error in case number 20CA011965 is overruled. Mr. Thomas's assignments of error in case number 20CA011964 are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed in part, reversed in part, and the matter is remanded for further proceedings.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

JENNIFER HENSAL
FOR THE COURT

TEODOSIO, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

JOHN A. MURPHY, JR., TODD A. HARPST, and JACQUELYN COLES-JONES, Attorneys at Law, for Appellants/Cross-Appellees.

PETER D. WELIN and JOHN A. GAMBILL, Attorneys at Law, for Appellees/Cross-Appellants.

NATHALIE A. DIBO and CLAIRE L. O'CONNOR, Attorneys at Law, for Mobile Center.

RONALD M. MCMILLAN and XIN WEN, Attorneys at Law, for Appellee.

ANECA E. LASLEY and ANDREW H. KING, Attorneys at Law, for Appellee.

DAN A. RICHARDS, Attorney at Law, for Dollar Tree Stores, Inc.

KATHERINE L. KEEFER, Attorney at Law, for Lorain County Treasurer.

PHILIP R. BAUTISTA and WILLIAM A. DOYLE, Attorneys at Law, for Petco Animal Supplies.