[Cite as *Four Elyria Co., L.L.C. v. Brexton Constr., L.L.C.*, 2025-Ohio-1778.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| | |
|---|---|
| FOUR ELYRIA COMPANY, LLC | C.A. No. 24CA012089 |
| Appellant/Cross-Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| BREXTON CONSTRUCTION, LLC, et al. | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellee/Cross-Appellant | CASE No. 17CV192092 |

DECISION AND JOURNAL ENTRY

Dated: May 19, 2025

HENSAL, Judge.

**{¶1}** Appellant/Cross-Appellee, Four Elyria Company, LLC ("Four Elyria"), appeals from the judgment of the Lorain County Common Pleas. Additionally, Appellee/Cross-Appellant, Brexton Construction, LLC ("Brexton"), cross-appeals. This Court affirms in part, reverses in part, and remands the matter for additional proceedings.

I.

**{¶2}** This is the second time this matter has come before the Court. Our first opinion outlined the factual and procedural history of this case in great detail. *See Four Elyria Co., LLC v. Brexton Constr., LLC*, 2022-Ohio-2989 (9th Dist.). It is unnecessary for us to repeat that entire history herein because this appeal involves fewer parties and issues. Accordingly, we limit our discussion to that which is necessary to resolve the appeal.

**{¶3}** Four Elyria sought to build a shopping plaza on commercial real estate property it owned in Elyria. The plaza would be named Chestnut Commons. It would consist of four leased

retail stores, one of which would be a Petco.  Four Elyria hired an architect ("the Architect") to design the project and a construction manager to oversee its construction.  Brexton is the construction manager Four Elyria hired.

{¶4}  The Architect provided Brexton with plans for Chestnut Commons.  The plans he provided Brexton included plans he had designed himself and Prototype Plans he had received directly from Petco.  The Architect did not prepare the Petco Prototype Plans.  The Prototype Plans showed tenant improvement work for a typical Petco store, but they were not site-specific to Chestnut Commons.  They included the following disclaimer:

> THIS DRAWING IS FOR DESIGN INTENT ONLY AND SHALL NOT BE USED FOR CONSTRUCTION PURPOSES. CONSTRUCTION DOCUMENTS MUST BE PREPARED BY AN AUTHORIZED, LICENSED DESIGN PROFESSIONAL FOR EACH INDIVIDUAL PROJECT.

The plans the Architect prepared himself included a section for "PROJECT NOTES."  Relevant to this appeal, that section included the following note:

> THIS PROJECT CONSISTS OF SHELL BUILDING AND LANDLORD'S T.I. WORK.  TENANT'S INTERIOR T.I. WORK TO BE SUBMITTED UNDER SEPARATE CONTRACT.  <u>THIS CONSTRUCTION SET NOT FOR OCCUPANCY</u>.

(Emphasis in original.)  It is undisputed that "T.I. WORK" meant tenant improvement work.

{¶5}  Brexton sent Four Elyria pricing information for the construction of Chestnut Commons.  The tendered price was termed the guaranteed maximum price ("GMP").  The parties then executed a GMP contract ("the Contract").  The Contract and its attachments defined the scope of work and total price for the Chestnut Commons project.  Per the Contract, Brexton would be "responsible for paying all costs of completing the Work which exceed the GMP, as adjusted in accordance with this Agreement."  "Work" was a defined term under the Contract.  The Contract

addressed potential changes to the Work that might impact the GMP. It required any such changes to be formalized by Change Order.

{¶6} Several months after the parties executed the Contract, Four Elyria sent Brexton additional drawings. The drawings, designed by Petco's architects, were for site-specific tenant improvement work at the Petco in Chestnut Commons ("the Site-Specific Work"). Brexton accepted the drawings. It substantially completed Chestnut Commons, including the Site-Specific Work, by November 2016. In late November, Brexton submitted two pay applications to Four Elyria. The first was for the balance due under the Contract. The second was for the retainage. Each pay application included an unconditional waiver and release of liens. Each unconditional waiver/release provided:

> [Brexton] has completed the work performed and the materials supplied to date represent the fair and actual value of work accomplished under the terms of the Contract and has been paid, receipt and sufficiency of which is hereby acknowledged, and does hereby waive, release and quitclaim in favor of [Four Elyria] . . . all rights that [Brexton] may have to a lien upon [Chestnut Commons] and improvements thereon by reason of or on account of any work, labor, services equipment and materials furnished by [Brexton] whether fully described and identified herein or not through the release date.

It is undisputed that Four Elyria paid Brexton the GMP under the Contract.

{¶7} After Four Elyria paid Brexton, Four Elyria learned that several of Brexton's subcontractors had not been paid for work they performed in connection with the Site-Specific Work. Brexton then contacted Four Elyria directly and demanded further payment. It became clear that the parties did not agree as to whether the Site-Specific Work was part of the Contract. According to Four Elyria, that work was part of the Contract and there were never any discussions about it causing an increase in the GMP. According to Brexton, the Site-Specific Work was never part of the Contract and Four Elyria specifically instructed it not to submit a Change Order for the work because Four Elyria did not want its lender to learn of the additional cost. Brexton expected

Four Elyria to pay it separately for the Site-Specific Work, which amounted to almost $500,000. The unresolved dispute led Brexton and several of its subcontractors to file mechanic's liens against Chestnut Commons.

{¶8} Four Elyria filed suit against Brexton and two of its officers. Its complaint included causes of action for breach of contract, fraud, and slander of title. Four Elyria alleged that Brexton breached the Contract by failing to pay its subcontractors. Four Elyria further alleged that Brexton committed fraud when its officers, to secure final payment from Four Elyria, executed unconditional releases and lien waivers with knowledge that Brexton and its subcontractors intended to seek more money from Four Elyria. Finally, Four Elyria alleged that Brexton slandered its title by filing a lien for money Brexton knew it was not owed.

{¶9} Brexton and its officers answered the complaint and filed counterclaims against Four Elyria. The counterclaims were for breach of contract, unjust enrichment, declaratory judgment, and foreclosure of its mechanic's lien. Brexton alleged that Four Elyria breached the Contract by failing to pay it in full for the Site-Specific Work. Alternatively, Brexton alleged that it was entitled to payment from Four Elyria under a theory of unjust enrichment. Brexton also asked the court to declare its lien valid and order foreclosure.

{¶10} Brexton moved for summary judgment on Four Elyria's complaint. It also moved for summary judgment on its own counterclaim for unjust enrichment. Four Elyria moved for summary judgment on its complaint. It also moved for summary judgment on each of Brexton's counterclaims. Each party filed responsive briefs as well as replies. The trial court ruled on the pending motions for summary judgment in a single judgment entry.

{¶11} The trial court found the parties had one written contract. It found the Site-Specific Work was not part of the Contract, so it was not included in the GMP. Those findings led the court

to conclude that no breaches of contract had occurred. Thus, it awarded summary judgment (1) to Brexton on Four Elyria's breach of contract claim, and (2) to Four Elyria on Brexton's counterclaim for breach of contract.

{¶12} The trial court next addressed Four Elyria's claims for fraud and slander of title. The court found the mutual releases and lien waivers executed by Brexton's officers only pertained to work Brexton had performed under the Contract. It found that the liens Brexton and its subcontractors had filed sought payment for the Site-Specific Work. Because the court found that work was not part of the Contract, it found the mutual releases and lien waivers did not apply to it. Those findings led the court to conclude that Brexton was entitled to summary judgment on Four Elyria's claims for fraud and slander of title.

{¶13} Finally, the trial court addressed Brexton's claim for unjust enrichment. The court found Brexton had conferred a benefit on Four Elyria when it completed the Site-Specific Work outside of the Contract. It found Four Elyria had retained that benefit without payment such that Brexton was entitled to damages. Those findings led the trial court to conclude that Brexton was entitled to summary judgment on its claim for unjust enrichment. The court set the matter for a jury trial on damages. The jury awarded Brexton $465,417.44.

{¶14} Following the jury's verdict, the parties filed several additional motions. Brexton moved to voluntarily dismiss its counterclaim for declaratory judgment. Four Elyria moved for summary judgment on Brexton's counterclaim for foreclosure. It argued that, by statute, Brexton could not pursue a mechanic's lien for a claim of unjust enrichment as such a claim amounted to a contract implied by law. Finally, both parties moved for an award of attorney fees. Upon review of their motions, the trial court dismissed the declaratory judgment counterclaim, awarded

summary judgment to Four Elyria on Brexton's counterclaim for foreclosure, and denied the respective motions for attorney fees.

{¶15} Four Elyria appealed from the trial court's judgment, and Brexton cross-appealed. Upon review, we determined that the trial court had not addressed several of Four Elyria's arguments in the first instance. *Four Elyria Co., LLC*, 2022-Ohio-2989, at ¶ 71 (9th Dist.). Those arguments pertained to the scope of the Contract and Four Elyria's claim for breach of contract. Rather than decide Four Elyria's arguments in the first instance, we remanded the matter to the trial court for review and decision. *Id.* at ¶ 72. We declined to address the remainder of Four Elyria's assignments of error or Brexton's assignment of error. *Id.* at ¶ 74-79.

{¶16} On remand, the trial court once again found the Site-Specific Work was not part of the Contract and not subject to any of its provisions. That finding led the trial court to conclude that no breaches of contract, fraud, or slander of title had occurred. The court further concluded that Brexton was entitled to recover under its counterclaim for unjust enrichment. Consequently, it once again entered summary judgment against Four Elyria on its complaint and for Brexton on its counterclaim for unjust enrichment.

{¶17} Four Elyria now appeals from the trial court's judgment and raises four assignments of error for review. Additionally, Brexton cross-appeals and raises one assignment of error for review.

II.

FOUR ELYRIA'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED BY FINDING THE PETCO T.I. WAS *NOT* INCLUDED IN THE GUARANTEED MAXIMUM PRICE AGREEMENT. (Emphasis in original.)

**{¶18}** In its first assignment of error, Four Elyria argues the trial court erred by awarding summary judgment to Brexton on Four Elyria's claim for breach of contract. It argues that, as a matter of law, the Contract included the Site-Specific Work. It further argues that Brexton was required to adhere to certain contractual provisions if it anticipated an increase in the GMP.

**{¶19}** Under Civil Rule 56(C), summary judgment is appropriate if:

> (1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). To succeed on a motion for summary judgment, the party moving for summary judgment must first be able to point to evidentiary materials that demonstrate there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). If the movant satisfies this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 293, quoting Civ.R. 56(E). This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).

**{¶20}** This Court also reviews a trial court's interpretation of a contract de novo. *Kallas v. Manor Care of Barberton, OH, L.L.C.*, 2017-Ohio-76, ¶ 8 (9th Dist.). "The object of contract interpretation is to ascertain and effectuate the intent of the parties." *Woodside Mgmt. Co. v. Bruex*, 2020-Ohio-4039, ¶ 19 (9th Dist.). Their intent "is presumed to be reflected in the language they selected to use in their agreement." *Id.* "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 2011-Ohio-2720, ¶ 37. "Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller-Gonzalez*, 2008-Ohio-

4838, ¶ 16. "[W]hether a contract is ambiguous is a question of law. . . ." *Tera, L.L.C. v. Rice Drilling D., L.L.C.*, 2024-Ohio-1945, ¶ 12. If contractual ambiguity does exist, "[i]t is generally the role of the fact-finder to resolve any ambiguity . . . ." *Id.*

{¶21} The trial court found the Contract unambiguous. A review of its provisions led the court to conclude that it did not include the Site-Specific Work. The court noted that the Contract defined the "Work" Brexton was to perform as well as the "Agreement" and "Contract Documents" upon which the Contract was based. The court also noted that the Contract contained an integration clause, meaning that it represented the entire agreement between the parties. The court found that neither the Petco Prototype Plans nor the Site-Specific Work plans were referenced in the Contract. The court found the Contract called for Brexton to complete the shell building and the landlord's tenant improvement work for the space that was to become Petco, not any site-specific tenant improvement work in that space. Although the Contract addressed Change Orders for price increases in the GMP, the court found those provisions inapplicable. Because the Site-Specific Work was not part of the Contract, the court reasoned, Brexton did not breach the Contract by failing to adhere to its Change Order provisions.

{¶22} In its first assignment of error, Four Elyria takes the position that the Contract was unambiguous. Its stance differs from that of the trial court in that Four Elyria insists the Contract unambiguously included the Site-Specific Work. It argues that a plain language reading of the Contract supports that conclusion. It also argues that, even if the Contract did not address the Site-Specific Work, it required Brexton to submit Change Orders for any anticipated increases in the GMP. Four Elyria argues the trial court erred in its summary judgment determination because it wrongly concluded that (1) the Contract did not include the Site-Specific Work, and (2) Brexton

did not have to secure a Change Order to be paid more money for that work. Before turning to Four Elyria's individual arguments, we begin with an overview of the Contract.

{¶23} The Contract identified Chestnut Commons as the "Project" under contract. Relevant to this appeal, it defined the "Project" as "the building, facility, or other improvements for which [Brexton] is to perform Work under this Agreement." Subsection 2.3.21. The Contract defined the terms "Work" and "Agreement." It defined "Work" as "the construction and services necessary or incidental to fulfill [Brexton's] obligations for the Project in conformance with this Agreement and the other Contract Documents." Subsection 2.3.27. It defined "Agreement" as follows:

> "Agreement" means this ConsensusDocs 500 Standard Agreement and General Conditions Between [Four Elyria] and [Brexton], as modified, and exhibits and attachments made part of this agreement upon its execution.
>
> The following attached exhibits are part of this Agreement:
>
> **SEE EXHIBIT A List of Drawings**
> **SEE EXHIBIT B GMP**
> **SEE EXHIBIT C Assumptions & Clarifications**
> **SEE EXHIBIT D Construction Schedule**
> **SEE EXHIBIT F Unit Prices/Wage Rates**

(Emphasis in original.) Subsection 2.3.1. All listed exhibits except for Exhibit D were attached to the Contract.

{¶24} The Contract contained both a definition for "Contract Documents" and a section titled "EXISTING CONTRACT DOCUMENTS." As noted, Brexton's "Work" under the Contract had to be completed "in conformance with this Agreement and the other Contract Documents." Subsection 2.3.27. The Contract defined "Contract Documents" as follows:

> The "Contract Documents" consist of this Agreement, the existing Contract Documents listed in section 15.1, drawings, specifications, addenda issued and acknowledged prior to execution of this Agreement, information furnished by [Four Elyria] pursuant to subsection 3.15.4, and modifications issued in accordance with this Agreement.

Subsection 2.3.4. Subsection 15.1 relatedly provided:

> EXISTING CONTRACT DOCUMENTS The Contract Documents in existence at the time of execution of this Agreement are as follows:
>
> **SEE EXHIBIT A List of Drawings**
> **SEE EXHIBIT B GMP**
> **SEE EXHIBIT C Assumptions & Clarifications**
> **SEE EXHIBIT D Construction Schedule**
> **SEE EXHIBIT F Unit Prices/Wage Rates**

(Emphasis in original.) Thus, the "EXISTING CONTRACT DOCUMENTS" in Subsection 15.1 were the same five exhibits made part of the "Agreement" under Subsection 2.3.1. As noted, each of those exhibits, except for Exhibit D, were attached to the Contract.

{¶25} Exhibit A consisted of two pages and was titled "The Drawings and Specifications." It contained a table graph with two columns. The first column was labeled "Sheet" and the second was labeled "Reference." The table included the following categories: civil drawings, architectural drawings, structural drawings, plumbing, mechanical, and electrical. It is undisputed that the table corresponded to the drawings the Architect completed for Chestnut Commons. Those drawings were labeled with numbers/subsections that matched the "Sheet" column on the table graph and titles that matched the "Reference" column. Several portions of the drawings referenced Petco by name and provided design specifications for items such as its façade, perimeter work, and shell design. The title sheet of the drawings included a section labeled "PROJECT NOTES." That section included the following note:

> THIS PROJECT CONSISTS OF SHELL BUILDING AND LANDLORD'S T.I. WORK. TENANT'S INTERIOR T.I. WORK TO BE SUBMITTED UNDER SEPARATE CONTRACT. <u>THIS CONSTRUCTION SET NOT FOR OCCUPANCY</u>.

(Emphasis in original.) The Petco Prototype Plans were not listed in Exhibit A.

{¶26} Exhibit B consisted of a single page with another table graph. The graph set forth a dollar amount for line items of work. The work was described by general category. For example,

line items of work included Sitework, Concrete, Masonry, Doors & Windows, Electrical, Plumbing, and HVAC. The list ended in a total cost per square foot and total amount. There is no dispute that the total amount listed on Exhibit B constituted the GMP. Exhibit B did not refer to Petco or any of the other tenants by name.

**{¶27}** Exhibit C contained a list of Assumptions & Clarifications. Relevant to this appeal, it contained a single line addressing Petco. That line read: "Completion date for Petco to be 08/27/16."

**{¶28}** The final exhibit attached to the Contract was labeled "WAGE SCHEDULE." Although it was described as "EXHIBIT F" in the Contract, the single page exhibit was labeled "EXHIBIT E." It contained a list of hourly wages for various positions such as project executive, project engineer, carpenter, and laborer. The exhibit did not refer to Petco or any of the other tenants by name.

**{¶29}** The Contract explicitly addressed the GMP. It provided, in relevant part, as follows:

> At such time as [Four Elyria] and [Brexton] agree the drawings and specifications are sufficiently complete, [Brexton] shall prepare and submit to [Four Elyria] in writing a GMP. The GMP proposal shall include the sum of the estimated cost of the Work . . . . [Brexton] . . . agrees that it will be responsible for paying all costs of completing the Work which exceed the GMP, as adjusted in accordance with this Agreement. **SEE EXHIBIT B GMP**

(Emphasis in original.) Subsection 3.4.1. The Contract required the written GMP to include "a list of the drawings and specifications, including all addenda, which were used in preparation of the GMP Proposal; **SEE EXHIBIT A**." (Emphasis in original.) Subsection 3.4.2.1.

**{¶30}** The Contract addressed the potential for incomplete Contract Documents and changes to the GMP. It provided:

> If the Contract Documents are not complete at the time the GMP proposal is submitted to [Four Elyria], [Brexton] shall provide in the GMP for further development of the Contract Documents. Such further developments [do] not include changes in scope, systems, kinds and quality of materials, finishes, or equipment, all of which, if required, shall be incorporated by Change Document.

Subsection 3.4.5. The Contract required "[c]hanges in the Work that are within the general scope of this Agreement [to] be accomplished . . . by Change Order and Interim Directed Change." ARTICLE 9 CHANGES. *See also* Subsection 9.1.1 ("All such changes in the Work shall be formalized in a Change Order."). It allowed Brexton to request and Four Elyria to order "changes in the Work . . . that impacts the GMP . . . ." Subsection 9.1.1. It called for the parties to negotiate an equitable adjustment to the GMP for changes in the Work. Section 9.1.2. It also relieved Brexton of any obligation "to perform changes in the Work that impact the GMP . . . until a Change Order has been executed or a written Interim Directed Change[1] has been issued." Subsection 9.1.3.

{¶31} Section 9.3 of the Contract addressed methods for pricing any increases or decreases in the GMP. A subsection included therein provided:

> If [Four Elyria] and [Brexton] disagree as to whether work required by [Four Elyria] is within the scope of the Work, [Brexton] shall furnish [Four Elyria] with an estimate of the costs to perform the disputed work in accordance with [Four Elyria's] interpretations.

Subsection 9.3.3. The following section, entitled "CLAIMS FOR ADDITIONAL COST OR TIME," also provided:

> Except as provided in subsection 6.3.2 and section 6.4 for any claim for an increase in the GMP . . . , [Brexton] shall give [Four Elyria] written notice of the claim within fourteen (14) Days after the occurrence giving rise to the claim or within fourteen (14) Days after [Brexton] first recognizes the condition giving rise to the claim, whichever is later. [Four Elyria's] failure to so respond shall be deemed a denial of [Brexton's] claim. Except in an emergency, notice shall be given before proceeding with the Work. Thereafter, [Brexton] shall submit written documentation of its claim, including appropriate supporting documentation, with

---

[1] The Interim Directed Change provisions allowed Four Elyria to direct an interim change in the Work prior to the parties reaching an agreement on adjustments to the GMP through Change Order.

twenty-one (21) Days after giving notice, unless the Parties mutually agree upon a longer period of time. No later than fourteen (14) Days after receipt, [Four Elyria] shall respond in writing denying or approving the claim. [Four Elyria's] failure to so respond shall be deemed a denial of the claim. Any change in the GMP . . . resulting from such claim shall be authorized by Change Order.

Section 9.4. The subsections referenced at the beginning of the foregoing block quote (i.e., subsection 6.3.2 and section 6.4) pertained to additional costs incurred due to delays caused by Four Elyria or requested by Brexton.

{¶32} The Contract contained an integration clause as well as a provision on joint drafting. The integration clause provided: "This Agreement represents the entire and integrated agreement between the Parties, and supersedes all prior negotiations, representations, or agreements, either written or oral." Subsection 14.1. The joint drafting provision required the Agreement, which was drafted by both parties, to be "construed in a neutral manner." Subsection 14.7.

{¶33} Four Elyria offers several reasons why the trial court erred when it concluded the Site-Specific Work was not part of the Contract. First, Four Elyria argues the Petco Prototype Plans were Contract Documents. As noted, Subsection 2.3.4 of the Contract defined "Contract Documents" as follows:

The "Contract Documents" consist of this Agreement, the existing Contract Documents listed in section 15.1, drawings, specifications, addenda issued and acknowledged prior to execution of this Agreement, information furnished by [Four Elyria] pursuant to subsection 3.15.4, and modifications issued in accordance with this Agreement.

Subsection 2.3.4. Four Elyria argues the Prototype Plans were Contract Documents because they were "issued and acknowledged" by Brexton before the parties executed the Contract. The trial court found the phrase "issued and acknowledged" only applied to "addenda." Four Elyria insists the trial court's interpretation is incorrect. It argues that the Contract, taken as a whole, supports the conclusion that the phrase "issued and acknowledged" applied to drawings and specifications

as well as addenda. Although the drawings for the Site-Specific Work were not complete when the parties executed the Contract, Four Elyria argues that the Contract expressly anticipated that there could be additional designs and drawings.

{¶34} Second, Four Elyria argues the trial court misinterpreted the project note the Architect included on the title sheet of his plans for Chestnut Commons. It asserts that the note plainly indicated "T.I. WORK" was part of the Project. Four Elyria also argues that the note, when taken in full context, was clearly intended to limit the Architect's responsibility for designing portions of the Project, not Brexton's obligations to construct it.

{¶35} Third, Four Elyria argues the trial court misinterpreted a portion of Exhibit C, which was a Contract Document. Exhibit C included the following line: "Completion date for Petco to be 08/27/16." The trial court found that line only referred to the completion of the shell building for Petco and the landlord tenant improvement work. Four Elyria argues the Site-Specific Work was necessary and incidental to the full completion of Petco, so it was included in the "Completion date for Petco . . . ."

{¶36} As noted, the intent of contracting parties is presumed to reside in the plain language of their contractual agreement. *Woodside Mgmt. Co.*, 2020-Ohio-4039, at ¶ 19 (9th Dist.). When contractual language is clear, a reviewing court cannot look beyond that language to determine intent. *Sunoco, Inc. (R&M)*, 2011-Ohio-2720, at ¶ 37. Upon review, Four Elyria has not shown the trial court erred when it found that the parties did not include the Site-Specific Work in their Contract.

{¶37} The Contract limited the Work to "the construction and services necessary or incidental to fulfill [Brexton's] obligations for the Project in conformance with this Agreement and the other Contract Documents." Subsection 2.3.27. A plain language reading of the Contract

defeats Four Elyria's argument that the Petco prototype plans were Contract Documents. Subsection 2.3.4 defined Contract Documents, in relevant part, as "drawings, specifications, addenda issued and acknowledged prior to the execution of this Agreement, . . ." and other items. There was no "and" before the word "addenda." Nor did the parties use semicolons in conjunction with commas to create subsets of items within the definition of Contract Documents. The definition was presented in list format with a comma separating each item and a single "and" before the last listed item. There is no indication that the parties intended the phrase "issued and acknowledged prior to the execution of this Agreement" to apply to anything other than addenda. Moreover, other contractual provisions support the conclusion that the Prototype Plans were not part of the Contract. *See Saunders v. Mortensen*, 2004-Ohio-24, ¶ 16 ("We have long held that a contract is to be read as a whole and the intent of each part gathered from a consideration of the whole.").

{¶38} The Contract required Brexton to prepare a GMP proposal including the sum of the estimated cost of the Work. Subsection 3.4.1. The proposal had to include "a written statement of its basis . . . ." Subsection 3.4.2. The written statement had to include "a list of the drawings and specifications, including all addenda, which were used in preparation of the GMP Proposal; *SEE EXHIBIT A* . . . ." (Emphasis added.) Subsection 3.4.2.1. As noted, Exhibit A listed, by sheet and reference, the drawings the Architect completed for Chestnut Commons. Those drawings did not include the Petco Prototype Plans, which were not prepared by the Architect. By citing Exhibit A as the sole source of the list of drawings, specifications, and addenda Brexton used to prepare its GMP proposal, the parties expressed their intent to limit the GMP to the work described in that specific document. No other drawings could be considered Contract Documents because only the drawings listed in Exhibit A were used to price the Work. Were other,

unincorporated drawings/specifications considered to be Contract Documents, the citation to Exhibit A in Subsection 3.4.2.1 would be rendered meaningless. That interpretation also would run afoul of the Contract's integration clause. Four Elyria's argument that the Prototype Plans were Contract Documents lacks merit.

{¶39} We also reject Four Elyria's arguments that the trial court misinterpreted language on the title sheet of the Architect's plans and language in Exhibit C. The "PROJECT NOTES" section of the title sheet read, in relevant part:

> THIS PROJECT CONSISTS OF SHELL BUILDING AND LANDLORD'S T.I. WORK. TENANT'S INTERIOR T.I. WORK TO BE SUBMITTED UNDER SEPARATE CONTRACT. THIS CONSTRUCTION SET NOT FOR OCCUPANCY.

(Emphasis in original.) Meanwhile, Exhibit C included the line: "Completion date for Petco to be 08/27/16." Neither quote contradicts our conclusion that the Contract only called for Brexton to perform work in connection with the drawings, specifications, and addenda listed in Exhibit A. There is no dispute that those items referred to Petco by name and provided design specifications for items such as its façade, perimeter work, and shell design. Yet, that work constituted tenant improvement work set by Four Elyria (i.e., the landlord), not site-specific, interior work set by Petco. A plain language review of the Contract, its exhibits, and the drawings included in Exhibit A leads to one conclusion: the Contract only called for Brexton to complete the shell building for Petco and related improvement work by the listed completion date. It did not include the Site-Specific Work on the building's interior. Accordingly, the trial court did not err when it found that the Contract, as written, did not include the Site-Specific Work.

{¶40} Next, Four Elyria challenges the trial court's conclusion that Brexton could seek additional money for the Site-Specific Work without securing a Change Order. The trial court held: "Because the Petco Tenant Improvements are not part of the [C]ontract, they are not subject

to the terms of the [C]ontract which address change orders, disputed work and the like." That ruling paved the way for a merits review of Brexton's claim for unjust enrichment. Four Elyria argues the trial court erred in its ruling because the whole purpose of the GMP Contract was to guarantee a maximum price and prevent Brexton from seeking additional compensation absent a Change Order. Four Elyria argues that, even if the Site-Specific Work was not included in the Contract, Article 9 of the Contract required Brexton to secure a written Change Order for any changes in scope and cost increases that would affect the GMP. It also argues that, under Subsection 10.8.7 of the Contract, Brexton waived any claim for more money when it accepted final payment under the Contract.

{¶41} To the extent Four Elyria argues that Brexton waived any claim it had for additional money by virtue of Subsection 10.8.7 of the Contract, the record reflects Four Elyria never raised that argument at the summary judgment stage. At no point in its summary judgment filings did Four Elyria cite, quote, or otherwise reference Subsection 10.8.7. "Arguments that were not raised in the trial court cannot be raised for the first time on appeal." *JPMorgan Chase Bank, Natl. Assn. v. Burden*, 2014-Ohio-2746, ¶ 12 (9th Dist.). Accordingly, we will not consider Four Elyria's argument insofar as it concerns Subsection 10.8.7.

{¶42} It is undisputed that, four months after the parties executed the Contract, Four Elyria provided Brexton with the plans for the Site-Specific Work. Petco's architects drafted those plans, and Four Elyria forwarded them to Brexton. Brexton completed the Site-Specific Work before Four Elyria made its final payment under the Contract. Neither party secured a Change Order addressing the Site-Specific Work. It is undisputed that Brexton secured four other Change Orders from Four Elyria with respect to the Project at Chestnut Commons. Each of those Change Orders resulted in an increase in the GMP, but none of them pertained to the Site-Specific Work.

{¶43} As previously noted, Article 9 of the Contract expressly addressed changes in the Work. It provided: "Changes in the Work that are within the general scope of this Agreement shall be accomplished, without invalidating this Agreement, by Change Order and Interim Directed Change." ARTICLE 9 CHANGES. The Contract allowed Brexton to request or Four Elyria to order changes in the Work that would impact the GMP. Subsection 9.1.1. It required "[a]ny such requests for changes in the Work [to] be processed in accordance with [Article 9]." *Id.* If the parties agreed there was to be a change in the Work, the Contract required them to "negotiate an equitable adjustment to the GMP . . . in good faith and conclude negotiations as expeditiously as possible." Subsection 9.1.2. It required all changes in the Work to be formalized in a Change Order. Subsection 9.1.1. If the parties disagreed as to whether work required by Four Elyria was within the scope of the Work, the Contract required Brexton to "furnish [Four Elyria] with an estimate of the costs to perform the disputed work in accordance with [Four Elyria's] interpretations." Subsection 9.3.3. The Contract relieved Brexton of the obligation to perform "changes in the Work that impact the GMP or the estimated Cost of the Work . . . until a Change Order has been executed or a written Interim Directed Change has been issued." Subsection 9.1.3. For "any claim for an increase in the GMP," the Contract required Brexton to give Four Elyria "written notice of the claim" as well as "written documentation of [the] claim" within a designated period. Subsection 9.4. It provided that, except in cases of emergency, Brexton's notice had to "be given before proceeding with the Work." *Id.*

{¶44} Upon review, we must conclude the trial court erred when it determined, as a matter of law, that the Contract's Change Order provisions did not apply because the Site-Specific Work was not part of the Contract. The plain language of the Contract addressed changes in the scope of the Work. Although the Contract did not include the Site-Specific Work, Four Elyria asked

Brexton to complete that work in connection with the Project. The proposed change in the scope of the Work should have triggered Article 9 and the Contract's change order provisions. *See* ARTICLE 9 CHANGES ("Changes in the Work that are within the general scope of this Agreement shall be accomplished, without invalidating this Agreement, by Change Order and Interim Directed Change."). We must conclude the trial court erred when it failed to apply those provisions.

**{¶45}** The trial court, having concluded that Article 9 had no application as a matter of law, did not consider and apply its provisions. Were this Court to apply Article 9 of the Contract, we would be doing so in the first instance. "This Court will not do so for the first time on appeal because that is not the function of a reviewing court." *Four Elyria Co., LLC*, 2022-Ohio-2989, at ¶ 72 (9th Dist.). On remand, the trial court must consider Article 9 and determine whether summary judgment is warranted in light of its provisions. Four Elyria's first assignment of error is sustained on that basis.

FOUR ELYRIA'S ASSIGNMENT OF ERROR II

> THE TRIAL COURT ERRED IN GRANTING BREXTON'S MOTION FOR SUMMARY JUDGMENT. ASSUMING THIS COURT DISAGREES WITH FOUR ELYRIA'S FIRST ASSIGNMENT OF ERROR AND FINDS THE PARTIES' AGREEMENT AMBIGUOUS, IT MUST CONSIDER *ALL RELEVANT EVIDENCE* TO ASCERTAIN THE PARTIES' INTENT WHICH IS A GENUINE ISSUE OF FACT FOR THE JURY. (Emphasis in original.)

**{¶46}** In its second assignment of error, Four Elyria argues that, if the Contract is ambiguous as to whether the scope of the Work included the Site-Specific Work, then the trial court erred by failing to consider all relevant evidence in ascertaining the intent of the parties. We have already determined that the Contract does not include the Site-Specific Work. In that respect, the Contract is not ambiguous. Because Four Elyria's second assignment of error is premised upon

the Contract having been found ambiguous, we must conclude that it is moot. Accordingly, we decline to address it. *See* App.R. 12(A)(1)(c).

FOUR ELYRIA'S ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED BY APPLYING UNJUST ENRICHMENT WHEN THE PARTIES HAD A WRITTEN AGREEMENT GOVERNING THEIR RELATIONSHIP. IT ALSO ERRED BY EXCLUDING EVIDENCE AT THE DAMAGES TRIAL ABOUT THE VALUE OF THE SERVICES PROVIDED BY BREXTON.

FOUR ELYRIA'S ASSIGNMENT OF ERROR IV

FOUR ELYRIA IS ENTITLED TO SUMMARY JUDGMENT ON ITS SLANDER OF TITLE AND FRAUD CLAIMS BECAUSE BREXTON CFO'S UNDISPUTED TESTIMONY SHOWS THAT BREXTON WRONGFULLY RECORDED A MECHANIC'S LIEN ON THE PROPERTY *AFTER* SECURING ITS FINAL PAYMENT ON THE PLAZA AND ATTESTING THAT BREXTON WAS PAID IN FULL UNDER THE GMP AGREEMENT. (Emphasis in original.)

**{¶47}** In its third assignment of error, Four Elyria argues the trial court erred by concluding Brexton was entitled to recover under a theory of unjust enrichment. It further argues the court erred by excluding certain evidence from the damages trial on the unjust enrichment claim. In its fourth assignment of error, Four Elyria argues the trial court erred by awarding summary judgment to Brexton on Four Elyria's claims for fraud and slander of title. It argues that the evidence showed Brexton wrongfully filed a mechanic's lien after it had already been paid in full.

**{¶48}** As we noted in the prior appeal in this matter, "the trial court's conclusion that the [Site-Specific Work] was outside the scope of the Contract affected its subsequent rulings, including its rulings on Four Elyria's remaining claims and Brexton's counterclaim for unjust enrichment." *Four Elyria*, 2022-Ohio-2989, at ¶ 73 (9th Dist.). Given that this matter must be remanded for further interpretation and application of the Contract, any review of the trial court's subsequent rulings would be premature. *See id.* For that reason, we decline to address Four

Elyria's remaining assignments of error. Its third and fourth assignments of error are overruled on that basis.

BREXTON ASSIGNMENT OF ERROR I

THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO AWARD BREXTON ITS ATTORNEYS' FEES EXPENDED IN DEFENDING FOUR ELYRIA'S BREACH OF CONTRACT CLAIMS.

**{¶49}** In its assignment of error on cross-appeal, Brexton argues the trial court abused its discretion by not awarding it attorney fees and costs. It argues that it was entitled to recover the fees and costs it expended defending against Four Elyria's claim for breach of contract because it was the prevailing party. Given our disposition of Four Elyria's first assignment of error, we decline to address Brexton's assignment of error at this time. *See Four Elyria*, 2022-Ohio-2989, at ¶ 77-79 (9th Dist.). Brexton's assignment of error is overruled on that basis.

III.

**{¶50}** Four Elyria's first assignment of error is sustained to the extent the trial court failed to consider Article 9 and determine whether summary judgment was warranted in light of its provisions. Four Elyria's second assignment of error is overruled as moot, and its remaining assignments of error are overruled as premature. Brexton's sole assignment of error is likewise overruled as premature. The judgment of the Lorain County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

 

JENNIFER HENSAL
FOR THE COURT

SUTTON, P. J.
CONCURS.

FLAGG LANZINGER, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶51} I agree with the majority's determination that the Site-Specific Work was not part of the Contract and not included in the GMP. I further agree that the trial court's summary judgment decision must be reversed. Unlike the majority, however, I would not remand this matter for the purpose of having the trial court conduct yet another summary judgment review. Instead, I would conclude that there are genuine issues of material fact for trial. As such, I would remand this matter for trial on Four Elyria's claim for breach of contract.

**{¶52}** When this Court reviewed the trial court's initial summary judgment ruling in the first appeal, we determined that its failure to address certain arguments inhibited our review. *Four Elyria Co., LLC v. Brexton Constr., LLC*, 2022-Ohio-2989, ¶ 71 (9th Dist.). We explained that,

> in reaching its decision, the trial court did not address Four Elyria's argument that the [Site-Specific Work] was included in the Contract because the Prototype Plans were "issued and acknowledged" prior to the execution of the Contract. The trial court also did not address Four Elyria's argument that, even if the [Site-Specific Work] was not included in the Contract (which Four Elyria disputed), the Contract still required Brexton to notify Four Elyria in writing of any increase in the [GMP] (i.e., Section 9.4), to submit a formal change order if changes in the work impacted the [GMP] (i.e., Section 9.1.1), and – if the parties disagreed as to whether certain work was within the scope of the Contract – to furnish Four Elyria with a cost estimate for the disputed work (i.e., Section 9.3.3). Instead, the trial court essentially found that, because neither the Prototype Plans nor the final, site-specific Petco plans were expressly incorporated into the Contract, the [Site-Specific Work], as a matter of law, was not part of the Contract and, consequently, the Contract had no application in this case.

*Four Elyria* at ¶ 71. We remanded the matter for the trial court to "set forth an analysis that permits our review." *Id.* at ¶ 72. Thus, we pinpointed unresolved issues regarding Article 9 of the Contract and afforded the trial court the opportunity to address those issues in the first instance.

**{¶53}** On remand, the trial court issued a ruling on the applicability of Article 9. It found that the terms of the Contract addressing change orders (i.e., those contained in Article 9) did not apply because the Site-Specific Work was not part of the Contract. A remand for the sole purpose of having the trial court review the same record and arguments for a third time is unnecessary. Because this Court reviews an award of summary judgment and a trial court's interpretation of a contract de novo, I believe we should conduct a merits review. *See Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996); *Kallas v. Manor Care of Barberton, OH, L.L.C.*, 2017-Ohio-76, ¶ 8 (9th Dist.) (summary judgment determinations and issues of contract interpretation reviewed de novo). Doing so conserves judicial resources and spares the parties additional, unnecessary delay and cost.

**{¶54}** I would conclude that the trial court erred when it determined, as a matter of law, that the Site-Specific Work was not subject to Article 9 and its Change Order provisions. Although the Site-Specific Work was not included in the Work Brexton was to perform under the Contract, Article 9 specifically addressed changes to the scope of the Work. It provided:

ARTICLE 9 CHANGES

> Changes in the Work that are within the general scope of this Agreement shall be accomplished, without invalidating this Agreement, by Change Order and Interim Directed Change.

The phrase "within the general scope of this Agreement" is ambiguous, as it is "susceptible of more than one reasonable interpretation." *Lager*, 2008-Ohio-4838, at ¶ 16. As further explained below, genuine issues of material fact remain as to whether the Site-Specific Work fell "within the general scope" of the Contract such that the Change Order provisions were triggered. Accordingly, I would conclude that the trial court erred by entering summary judgment.

**{¶55}** Although the Petco Prototype Plans were not part of the Contract, it is undisputed that Four Elyria, through the Architect, provided Brexton with those plans before the parties executed the Contract. It is also undisputed that both parties understood Brexton would be the one to complete the Site-Specific Work. Timothy Galvin, the CEO of Brexton, testified by deposition as its Civ.R. 30(B)(5) witness. He testified that, even at the time Brexton executed the Contract with Four Elyria, Brexton knew it would eventually be completing the tenant improvements in Petco.

**{¶56}** Mr. Galvin testified that Four Elyria promised to pay Brexton additional money for the Site-Specific Work. It was his understanding that Four Elyria and Brexton entered into a separate, oral contract wherein Brexton promised to perform the Site-Specific Work and Four Elyria promised to pay for that work separately. Yet, it was also his testimony that Brexton

prepared a Change Order for the Site-Specific Work. He testified that Four Elyria verbally instructed Brexton not to submit the Change Order because it did not want its lender to know the Project had gone over budget. He testified that Four Elyria repeatedly gave assurances it would pay for the Site-Specific Work with funds from another source. Mr. Galvin testified that Brexton had other construction contracts with Four Elyria. Those contracts also contained change order provisions. According to Mr. Galvin, Four Elyria had paid for additional work on those other contracts without requiring written change orders.

**{¶57}** At the time of her deposition, Mary Beatty was the president of Brexton. She testified that she held other positions before that time, including positions as Brexton's chief financial officer and executive vice present. Ms. Beatty testified that the accounting representative assigned to the Contract with Four Elyria advised her that Brexton was preparing a Change Order for the Site-Specific Work. Ms. Beatty later learned that Four Elyria had instructed Brexton not to submit a Change Order for the Site-Specific Work due to issues with its lender. She learned this information from the manager in charge of the Contract with Four Elyria and the accounting representative associated with the prepared Change Order. According to Ms. Beatty, it was common knowledge that a large Change Order for the Site-Specific Work was forthcoming and Four Elyria's owners were aware of it. She testified that she was familiar with Four Elyria's owners due to Brexton's interactions with them on other construction contracts. She testified it "was their MO . . . to not be organized or professional" and to expect Brexton to perform work based on a promise of future payment.

**{¶58}** Grant Giltz, part owner of Four Elyria, testified as its Civ.R. 30(B)(5) witness. Mr. Giltz indicated that other members of Four Elyria handled its legal work and were the primary point of contact between Four Elyria and Brexton. He testified that his contact with Brexton was

limited. According to Mr. Giltz, Brexton's representative acknowledged Brexton was having trouble paying its subcontractors but assured Four Elyria those issues would be resolved. He testified that Brexton's representative mentioned additional costs a few times but never specifically attributed them to Petco. Mr. Giltz was not aware of any discussion wherein Four Elyria promised to pay Brexton separately for the Site-Specific Work or instructed Brexton not to submit a Change Order. He testified that he could not speak directly for other members of Four Elyria but had never personally told Brexton not to submit the additional costs. It was Mr. Giltz' position that the Site-Specific Work was always part of the Contract and the GMP.

{¶59} In his deposition, David Thomas testified that he was a member of Four Elyria as well as an attorney. Mr. Thomas indicated that he handled Four Elyria's legal work, including the Contract with Brexton. He testified that the Site-Specific Work was always meant to be part of the Contract and the GMP. He indicated that, in addition to the Petco Prototype Plans, Four Elyria provided Brexton with the plans for the Site-Specific Work and a copy of its lease with Petco with the understanding that Brexton would complete the Petco build in its entirety.

{¶60} The foregoing testimony could result in more than one reasonable conclusion. The first is that the Site-Specific Work was never part of the Contract, but the parties later executed a separate, oral contract regarding that work. That conclusion is bolstered by the significant cost of the Site-Specific Work, the fact that the Site-Specific Work was detailed in entirely separate architectural plans, the fact that the parties used Change Orders for other work that increased the GMP under the Contract, and testimony that the parties reached a separate agreement regarding the Site-Specific work. A second reasonable conclusion is that the Site-Specific Work fell within the general scope of the Contract, triggered Article 9, and required Brexton to comply with the Change Order provisions. That conclusion is bolstered by testimony that both parties always knew

Brexton would complete the tenant improvements, the Site-Specific Work was consistently under discussion from the outset, and Brexton did, in fact, prepare an uncirculated Change Order for the Site-Specific Work. A third reasonable conclusion is that, even though the Site-Specific Work triggered Article 9, Four Elyria waived any written Change Order requirements for that work. That conclusion is bolstered by testimony, if believed, that Four Elyria verbally instructed Brexton not to submit a Change Order for the Site-Specific Work.

{¶61} If ambiguity exists in a contract, "[i]t is generally the role of the fact-finder to resolve any ambiguity . . . ." *Tera, L.L.C.*, 2024-Ohio-1945, at ¶ 12. Although the Site-Specific Work was not part of the Contract, the Contract addressed changes in the scope of the Work. I would conclude that genuine issues of material fact remain regarding the scope of the Contract, the applicability of Article 9, and the possible waiver of the contractual provisions contained therein on the part of Four Elyria. Because genuine issues of material fact remain, I would conclude that the trial court erred by entering summary judgment in favor of Brexton. Thus, I would remand this matter for trial on Four Elyria's claim for breach of contract and sustain its first assignment of error on that basis.

APPEARANCES:

TODD A. HARPST, CHRISTINE M. GARRITANO, and JOHN A. MURPHY, JR., Attorneys at Law, for Appellant/Cross-Appellee.

JOHN A. GAMBILL and JOSEPH P. GUENTHER, Attorneys at Law, for Appellees/Cross-Appellants.

DAN A. RICHARDS, Attorney at Law, for Appellee, Dollar Tree Stores, Inc.

RICHARD M. MCMILLAN and XIN WEN, Attorneys at Law, for Appellee, Protective Life Insurance Co.

KATHERINE L. KEEFER, Attorney at Law, for Appellee, the Lorain County Treasurer.

MYRL H. SHOEMAKER, Attorney at Law, for Appellee, the Ohio Department of Taxation.